**John D. CARBINE and Eleanor W. Carbine, Petitioners-Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 85–3061.**

United States Court of Appeals, Eleventh Circuit.

Dec. 6, 1985.

Harry K. Mansfield, R.K. Gad, III, Boston, Mass., for petitioners-appellants.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief, Richard Farber,

John Dudeck, Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before RONEY and ANDERSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

ANDERSON, Circuit Judge:

Appellants John D. and Eleanor W. Carbine ("Carbine") challenge the decision of the Tax Court, 83 T.C. 356, in favor of the Commissioner of Internal Revenue ("Commissioner") finding them liable for tax deficiencies for the years 1977 and 1978. The issue before us is whether Carbine may deduct premiums paid with respect to an insurance policy on the life of John Carbine. We affirm the decision of the Tax Court that such payments are not deductible.

## I.  FACTS

Carbine held a twenty percent stock interest in Burgess-Carbine Associates, Inc. ("BCA"), a corporation engaged in the business of a general insurance agency. In November 1973, BCA obtained a loan commitment from First Vermont Bank & Trust Co. ("Bank") for the purpose of financing the purchase of another insurance agency. The Bank specifically required Carbine to guarantee all BCA notes issued under the commitment and to hypothecate stocks and/or bonds needed to secure the loan. Several advances were made pursuant to the loan commitment, all of which were evidenced by notes of BCA.

In a transaction independent of the BCA loan, Carbine signed a general hypothecation agreement covering all obligations of BCA to the Bank whenever arising. Pursuant to the general hypothecation agreement, Carbine pledged to the Bank certain securities and insurance policies owned by him.

On November 1, 1976, the outstanding notes of BCA under the 1973 loan commitment were consolidated into a single new seven-year term note. Appropriate documents were signed to accomplish a continuation of Carbine's status as a guarantor and a continuation of the pledge of Carbine's individually owned collateral.

In order to provide additional collateral to secure the term note, BCA obtained an insurance policy on the life of Carbine. The life insurance policy was issued on January 24, 1977. On March 3, 1977, BCA assigned the life insurance policy to the Bank as security for the term note. On that date the designated beneficiary of the policy was BCA.

Under the provisions of the financing documents, the Bank could dispose of the stock owned by Carbine and pledged to secure BCA's indebtedness if BCA defaulted on its obligations or if the collateral available to the Bank became insufficient to secure BCA's obligations, unless additional collateral was deposited or the note was paid down.

During 1977 and 1978, BCA encountered financial difficulties and became unable to pay both the amounts owing on the term note and the life insurance premiums. BCA chose to apply its limited funds first to the payment of the term note and then to the payment of the insurance premiums. Because nonpayment of the premiums would have allowed the bank to sell the securities owned by Carbine and held by the bank under the general hypothecation agreement and the term loan, Carbine personally paid all the premiums on the life insurance policy which were not paid by BCA. BCA was not obligated to, and did not in fact, reimburse petitioner Carbine for these payments.

Carbine made total premium payments with respect to the policy of $14,486.59 in 1977 and $8,912.73 in 1978. On his 1977 and 1978 federal income tax returns, Carbine treated the premium payments as expenses incurred to protect income-producing property and claimed a deduction under

§ 212 of the Internal Revenue Code (the "Code") for the full amount paid.

In his notice of deficiency, the Commissioner disallowed the deductions claimed by Carbine with respect to the premiums paid on the life insurance policy. The Tax Court ruled that the payment of the life insurance premiums by Carbine constituted "ordinary and necessary" expenses within the meaning of § 212(2).[1] However, the court held that the deduction of the premiums was precluded by § 264(a)(1)[2] of the Code because Carbine was an indirect beneficiary of the insurance policy.

## II. DISCUSSION

Carbine makes two primary arguments on appeal: (1) that § 264(a)(1) does not apply to a deduction claimed for a non-business expense under § 212; and (2) that, if § 264(a)(1) does apply to such deductions, Carbine was not a direct or indirect benefi-

1. The government contends that § 212(2) of the Code was inapplicable because the premium payments were not ordinary and necessary. We need not decide the issue, because we affirm the Tax Court decision that § 264(a)(1) bars deduction of premium payments made by someone indirectly benefitted under the policy.

2. Section 264 provides in part as follows:
   Section 264. Certain amounts paid in connection with insurance contracts.
   (a) General Rule—No deduction shall be allowed for—
   (1) Premiums paid on any life insurance policy covering the life of any officer or employee, or of any person financially interested in any trade or business carried on by the taxpayer, when the taxpayer is directly or indirectly a beneficiary under such policy.
   26 U.S.C. § 264(a)(1).

3. Section 162 provides in part:
   Section 162. Trade or business expenses.
   (a) In general. There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business ...
   26 U.S.C. § 162(a).

4. Section 212 provides:
   Section 212. Expenses for production of income.
   In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

ciary under the life insurance policy. We deal with each argument in turn.

### A.

■ Carbine contends that § 264(a)(1) applies only to life insurance premiums paid by a taxpayer in the course of a "trade or business" and, thus, bars only trade or business expenses otherwise deductible under § 162 of the Code.[3] Because § 212(2)[4] pertains to nonbusiness expenses and not to "trade or business" expenses, Carbine argues that premium payments made under § 212(2) are outside the scope of § 264(a)(1).

The Second Circuit addressed this question in *Meyer v. United States*, 175 F.2d 45 (2d Cir.1949). That court held that payments of life insurance premiums, which would otherwise have been deductible under the predecessor of § 212(2),[5] were nondeductible under the predecessor of § 264(a)(1). We agree with the rationale of the *Meyer* decision and adopt its holding.[6]

(1) for the production or collection of income;
(2) for the management, conservation, or maintenance of property held for the production of income; or
(3) in connection with the determination, collection, or refund of any tax.
26 U.S.C. § 212.

5. *Meyer* arose under the 1939 Code and involved § 24(a)(4), which is identical with § 264(a)(1) of the 1954 Code involved here, and § 23(a)(2), which was the predecessor of § 212(2) of the 1954 Code and which was in relevant portions identical with the relevant portions of § 212(2).

6. Carbine contends that *Meyer* is an outdated case. While § 24(a)(4) and § 23(a)(1), the predecessor of § 162, had both been embodied in the 1939 codification, § 23(a)(2) was only added in 1942. The *Meyer* decision held that the new provisions of § 23(a)(2) relating to "ordinary and necessary" non-business expenses were subject to the same limitations—including § 24(a)(4)—applicable to "ordinary and necessary" business expenses under § 23(a)(1). Carbine argues that, because §§ 264(a)(1) and 212(2) were simultaneously codified in 1954 and because in enacting § 264(a)(1) Congress did not amend the language of § 24(a)(4) to expressly bar deductions of non-business expenses for life insurance premiums, the reasoning of *Meyer* is obsolete. Specifically, Carbine urges that non-simultaneous enactment was a crucial element in the *Meyer* decision and that that factor was eliminated by the 1954 codification.

Therefore, we affirm the decision of the Tax Court that § 264(a)(1) may be a limit on § 212 deductions.

## B.

The issue that remains for our consideration is whether § 264(a)(1) forecloses deduction for payments that would be deductible otherwise because Carbine was "directly or indirectly" a beneficiary under the life insurance policy. The parties agree that Carbine was not a "direct" beneficiary. At the time Carbine made the premium payments in question, BCA was the only designated beneficiary of the policy. Because BCA had assigned the contract to the Bank, the policy proceeds were payable first to the Bank, up to the amount of the outstanding balance on the term note. Any excess policy proceeds were payable solely to BCA. Thus, we must determine whether Carbine was an "indirect" beneficiary under the policy.

█ Carbine contends that he was not a beneficiary under the BCA life insurance policy because payment of the premiums did not entitle him to any direct or indirect economic rights or interests in the policy. The court recognizes that Carbine did not take out the policy, was not a named beneficiary under the policy, and did not have the right to designate the beneficiary. In addition, if BCA had paid off the term note, the policy proceeds in the event of Carbine's death would have been payable solely to BCA or another beneficiary designated by BCA. Also, if BCA had defaulted on the note before Carbine's death and thus before the policy matured, the bank could have called Carbine's guarantee, and the life insurance policy would not have provided Carbine with any protection. However, we find that as long as the note remained unpaid, Carbine was an indirect beneficiary

of the policy because the liabilities of his estate would have been reduced if the policy had matured (i.e., upon Carbine's death) while the Bank was the assignee of the policy. In other words, during the time that the policy was assigned to the Bank, upon Carbine's death the policy proceeds would have been paid to the bank and thus would have reduced the debt which Carbine had guaranteed and which his individual assets had been pledged to secure.

In *D'Angelo Associates, Inc. v. Commissioner*, the Tax Court stated:

> Whether the taxpayer is the primary obligor or guarantor, the insurance serves to provide a source of funds from which to satisfy the obligation in the event of the insured's death, relieving petitioner of any further liability under the guarantee, or if as is more likely, the obligation is paid in due course petitioner would be the owner of the policy unimpaired by any incumberances.

70 T.C. 121, 137 (1978).[7] Carbine contends that he is not in a comparable position to the taxpayer in *D'Angelo*. While it is true that Carbine would not become the direct beneficiary if the indebtedness were paid off by BCA, proceeds of the policy could be used to satisfy Carbine's obligations under the guarantee. It is not necessary that both possibilities exist, i.e., (1) that the policy could mature to his benefit while assigned to the Bank, and (2) that the policy could mature to his benefit after the note was paid off. One indirect benefit in existence at the time taxpayer pays the premium is enough to satisfy the test under § 264(a)(1). "*Any* of the above considerations constitute a direct or indirect benefit within the meaning of section 264(a)(1)." *Glassner v. Commissioner*, 43 T.C. 713, 716 (1965) (emphasis added), *aff'd*, 360 F.2d

---

Essentially, Carbine contends that the "trade or business" language of § 264(a)(1)—which did not preclude application of § 24(a)(4) to § 23(a)(2)—should now prevent application of § 264(a)(1) to § 212(2) because the sections were recodified by Congress. This argument is without merit and does not warrant further discussion.

**7.** In *D'Angelo*, a corporate officer borrowed a certain sum of money. The loan was guaranteed by the taxpayer corporation which also took out an insurance policy on the officer's life and assigned it as collateral to secure the loan.

33 (3d Cir.), *cert. denied,* 385 U.S. 819, 87 S.Ct. 44, 17 L.Ed.2d 57 (1966).

In *Glassner,* the taxpayer, in order to secure his indebtedness, obtained life insurance, paid the premiums thereon, designated his creditors as beneficiaries, and gave his creditors exclusive control over the policies. Thereafter, Glassner made payments to his creditors which sums were to be used to make premium payments on the insurance policies which he had turned over to them. The Tax Court found that Glassner was benefited by the policies because he was permitted to continue practicing his profession unhindered by his creditors, because his estate's indebtedness would be reduced by the proceeds of the policy if it matured while assigned to his creditors, and because, if he had managed to pay off the indebtedness, the policy would revert to him. As noted above, the Tax Court held that *any* of these considerations constituted a direct or indirect benefit within the meaning of the statute. *Glassner v. Commissioner,* 43 T.C. at 716.

In *Klein v. Commissioner,* 31 B.T.A. 910 (1934), *aff'd,* 84 F.2d 310 (7th Cir.1936), the taxpayer, in order to obtain a loan, procured insurance upon his own life and placed the policies in trust as security for the loan. The policies were payable to his creditor, and the taxpayer did not reserve the right to change the beneficiary. The

Tax Court stated that it was immaterial that the taxpayer's estate would not be the direct beneficiary of the policies and that the taxpayer did not reserve the right to change the beneficiary. It held that the taxpayer was an indirect beneficiary because "if payment were made to the creditor upon these life insurance policies, it would indirectly augment the petitioner's estate by decreasing the liabilities." *Klein,* 31 B.T.A. at 919. The Seventh Circuit affirmed on the same rationale. 84 F.2d at 311.[8] Thus, the one indirect benefit was sufficient to preclude deduction of the premiums paid. *See also Rieck v. Heiner,* 25 F.2d 453 (3d Cir.), *cert. denied,* 277 U.S. 608, 48 S.Ct. 603, 72 L.Ed. 1013 (1928).[9]

The foregoing cases reflect long established reasoning that the reference in § 264(a)(1) to indirect beneficiary status is satisfied if payment of the policy proceeds would indirectly augment the petitioner's estate by decreasing its liabilities. Carbine has cited no cases to the contrary, and our research has uncovered none. We see no reason to depart from this established rule. The policy that the law should be stable and predictable "is especially important in the tax laws, because there is widespread reliance by taxpayers upon established tax principles in planning their affairs." *Estate of Bright v. United States,* 658 F.2d 999, 1006 (5th Cir. Oct. 1, 1981) (en banc).[10]

---

**8.** It is true that *Klein* could be distinguished on its facts because there was a possibility that the insured taxpayer would succeed to unrestricted ownership of the policies upon payment of the loan, or reducing the amount thereof. 31 B.T.A. at 915. However, the rationale of the decision, as set out in the text, applies with equal force to this case.

**9.** The Tax Court in *Klein* relied primarily on the decision in *Rieck v. Heiner,* 25 F.2d 453 (3d Cir.), *cert. denied,* 277 U.S. 608, 48 S.Ct. 603, 72 L.Ed. 1013 (1928). In *Rieck,* the taxpayer had placed as collateral to secure a loan an insurance policy upon his own life, the beneficiary of which was his own estate. The court held that the premiums paid by the taxpayer were not deductible. It stated:

> Though assigned to and held by the creditor and for two years used as a collateral security, it was, none the less, a policy in which the taxpayer was "directly or indirectly" a beneficiary, for if it had matured when held as

collateral, and payment had been made to the creditor, it would indirectly have augmented his estate by decreasing his liabilities. Or if it had matured after it was returned to him by the creditor and payment had been made to the estate the taxable [sic] would have benefited directly.

*Rieck v. Heiner,* 25 F.2d at 454.

It is clear that the court did not require that both possibilities for the taxpayer to benefit exist—the sentences quoted above are disjunctive. Thus, again it appears that only one indirect benefit, *e.g.,* the possible augmenting of the taxpayer's estate by a decrease in its liabilities, would have been enough to bar deduction of the premium payments.

**10.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all of the post-September 30, 1981, decisions of the full en banc court of the former Fifth Circuit. *Id.* at 34. *Cf. Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981)

## III. CONCLUSION

While BCA's life insurance policy on the life of Carbine was assigned to the Bank, Carbine was an indirect beneficiary under the policy. If the policy had matured, his estate would have been indirectly augmented by the decrease in its liabilities. Thus, the Tax Court correctly decided that, under § 264(a)(1), Carbine improperly deducted the premium payments he made on this insurance policy in 1977 and 1978. The decision of the Tax Court is

AFFIRMED.

(en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).