GRACE FOREIGN EXCHANGE CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Grace Foreign Exch. Corp. v. Commissioner
Docket No. 1291-92
United States Tax Court
T.C. Memo 1994-621; 1994 Tax Ct. Memo LEXIS 628; 68 T.C.M. (CCH) 1464; T.C.M. (RIA) 94621; December 19, 1994, Filed *628 Decision will be entered under Rule 155. For petitioner: Peter S. Buchanan. For respondent: Charlotte A. Mitchell. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined a deficiency in petitioner's Federal income tax for fiscal year ended May 31, 1987, of $ 559,531, and additions to tax of $ 27,976 under section 6653(a)(1)(A), [1]50 percent of interest due on the deficiency under section 6653(a)(1)(B), and $ 139,883 under section 6661. The issues for decision are: (1) Whether petitioner has unreported taxable income for fiscal year ended May 31, 1987. We hold that petitioner did not underreport its taxable income. (2) Whether amounts were paid to Oscar Jesena, the corporation's Philippine agent, and whether those amounts constituted deductible ordinary and necessary business *629 expenses. We hold that the amounts were paid to or on behalf of Oscar Jesena and that the expenses are ordinary and necessary business expenses. (3) Whether petitioner is entitled to carry back a net operating loss (hereinafter NOL) deduction of $ 97,661 from the tax year ended December 31, 1989, to the tax year ended May 31, 1987. [2] (4) Whether petitioner is liable for additions to tax under sections 6653(a)(1)(A) and (B) and 6661. Petitioner is not liable for additions to tax because there is no underpayment of tax. FINDINGS OF FACT Grace Foreign Exchange Corp. is a California corporation with its *630 principal office located in the State of California at the time it filed its petition. Petitioner is a cash basis taxpayer with a May 31 fiscal yearend. Petitioner timely filed a Federal corporation income tax return for the fiscal year ended May 31, 1987. Petitioner's primary business is to receive U.S. dollars from customers and to transmit funds in the form of Philippine pesos to Philippine resident beneficiaries for a fee. Petitioner was granted a license by the California State Banking Department to engage in the business of transmission of money abroad on April 8, 1981; petitioner is subject to the California Financial Code. Since its inception, Cyrus Santa Maria and Luisa Santa Maria, husband and wife, have been the sole officers, directors and shareholders in petitioner. Mrs. Santa Maria was born in the Philippines and is now a U.S. citizen. Mr. Santa Maria was born in the United States. Oscar Jesena is the brother of Luisa Santa Maria and is a Philippine citizen and resident. Mr. Jesena signed a contract with petitioner to act as petitioner's agent in the Philippines. In that contract, Mr. Jesena agreed to deliver all of petitioner's Philippine orders for $ 1 per *631 order, plus reimbursement of certain expenses. Because petitioner employed Mr. Jesena in the Philippines, petitioner had a competitive advantage in that petitioner was able to deliver funds to Philippine beneficiaries usually within 1 or 2 days. Also, with this arrangement both petitioner and Mr. Jesena were able to save bank transaction costs and exchange differentials. Petitioner's employees gathered orders from customers in the United States. Petitioner's employees then communicated to Mr. Jesena by telephone and facsimile machine (hereinafter fax) the names and addresses of recipients and the amounts (and sometimes a message) to be delivered. Mr. Jesena obtained cash in the Philippines through borrowings and other sources and delivered the appropriate amount of pesos to the appropriate customer. This case arises in part because of petitioner's unconventional arrangements with Mr. Jesena. Petitioner did not reimburse Mr. Jesena directly for the payments he made to the Philippine beneficiaries. Instead, petitioner reimbursed Mr. Jesena by two methods. First, Mr. Jesena collected pesos from Philippine customers who wanted U.S. dollars sent to U.S. residents. The monetary *632 value of Mr. Jesena's orders amounted to approximately one half of the monetary value of petitioner's orders during the year in issue. [3] By filling Mr. Jesena's U.S. orders, in effect, petitioner reimbursed Mr. Jesena approximately one half of the amount that he expended for petitioner by this method. Mr. Jesena thus had to obtain a second source of pesos in order to timely fill all of petitioner's orders. He borrowed those funds from a family group that he refers to as "Labor". The Labor group is a family whose members are located in Los Angeles, California, Hong Kong, and the Philippines. Mr. Jesena would accompany a Labor employee to the bank to obtain the cash he required each time he needed to deliver pesos. Mr. Jesena paid the vast majority of the Philippine beneficiaries by delivering cash to their door. Each time Mr. Jesena obtained pesos he incurred a debt to the Labor group. Mr. Jesena would ask petitioner's employees *633 at the Los Angeles or San Diego offices to deliver U.S. dollars to the Labor office located in Los Angeles [4] to repay the debt incurred in the Philippines. When petitioner paid Labor the requested funds, petitioner was in effect repaying Mr. Jesena for the funds that he had expended when he delivered Philippine pesos to petitioner's customers' beneficiaries. During the period from June 1, 1986, through May 31, 1987, petitioner received orders from customers in the total amount of $ 56,805,439 for transmission to beneficiaries in the Philippines. During that same period, petitioner remitted to Mr. Jesena's customers' beneficiaries in the United States $ 27,754,726. The amount in dispute in regard to the unreported income issue in this case involves the amount that petitioner remitted to Labor during the taxable year. Petitioner agreed to pay Mr. Jesena $ 1 per delivery and to reimburse Mr. Jesena for his costs regarding *634 bank charges, telegram expenses, fuel, and other expenses related to Mr. Jesena's costs of delivering the funds as requested by petitioner. During the fiscal year in question, Mr. Jesena and his employees delivered over 200,000 orders. In addition to the $ 1 per transaction, Mr. Jesena billed petitioner for expenses of $ 125,382.77 for the months ended May 31 through December 31, 1986, and $ 60,356.35 for the period January 1 to April 30, 1987, a total of $ 185,739.12. In total, petitioner's expense for items remitted to Mr. Jesena, including the $ 1 per transaction service fee for the fiscal year ended May 31, 1987, is $ 407,620. Of this, $ 403,489 has been disallowed by respondent. [5]
*635 Mrs. Santa Maria wrote checks from petitioner to Oscar Jesena for payment of his service charges and costs in some of the months. She then endorsed those checks under Mr. Jesena's power of attorney and with his knowledge and redeposited them into petitioner's bank account. OPINION Issue 1. Unreported Income
Respondent asserts that petitioner had $ 733,714 of unreported income. Respondent contends that petitioner received funds from customers that it did not pay to Philippine beneficiaries. Respondent agrees with petitioner that it was required to deliver $ 56,805,439 to Philippine beneficiaries, but insists that petitioner paid out only $ 56,071,726 [6] of this amount, thus underpaying Philippine beneficiaries and underreporting taxable income. Petitioner states that it paid all required funds to Philippine beneficiaries, *636 citing the following facts. Petitioner began business in 1980, with only one location; during the year in question petitioner was operating five locations in four California cities; by the time of trial, petitioner was operating 17 locations in cities all along the west coast. To the date of trial petitioner has never been sued by a customer for nondelivery of funds, nor has petitioner had any complaints lodged against it by the California State Banking Department. During the year in question petitioner received over $ 56 million to transmit to the Philippines. Petitioner's president, Mr. Santa Maria, asserts that his company would never have had such tremendous success if it was negligent in paying funds to Philippine beneficiaries. A taxpayer has a responsibility to keep books and records that accurately reflect its taxable income and expenses for each taxable year. Sec. 6001. In the absence of adequate records, the Commissioner may use a method of reconstruction that clearly reflects income. Sec. 446(b); Holland v. United States, 348 U.S. 121 (1954). The reconstruction of income need only be reasonable in light of all surrounding facts and *637 circumstances. Giddio v. Commissioner, 54 T.C. 1530 (1970). If the taxpayer believes the Commissioner's method of computation is unfair or inaccurate, the burden is on the taxpayer to show such unfairness or inaccuracy. DiLeo v. Commissioner, 96 T.C. 858, 871 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Gross income includes all income from whatever source, except as otherwise provided in the Code. Sec. 61; Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955). The Commissioner's determination has a presumption of correctness, Welch v. Helvering, 290 U.S. 111 (1933), and the presumption may be rebutted only if the taxpayer proves by a preponderance of the evidence that the deficiency is incorrect or was arbitrarily derived, Clark v. Commissioner, 266 F.2d 698, 706 (9th Cir. 1959), remanding T.C. Memo. 1957-129. Here, respondent agrees with petitioner that it was required to deliver $ 56,805,439 to Philippine beneficiaries. Respondent acknowledges that petitioner delivered *638 $ 27,754,726 to some of the foreign beneficiaries. But respondent contends petitioner reimbursed Mr. Jesena only $ 28,317,000 for money borrowed from Labor, not $ 28,910,000 as petitioner claims. According to the books and records it appears that petitioner paid $ 28,841,955 to Labor and had an increase in payables to foreign beneficiaries (amounts petitioner held in trust for the purpose of paying Philippine beneficiaries) of $ 208,758. [7] With these payments and the increase in payables to foreign beneficiaries, petitioner has accounted for payment of all of the funds that it was entrusted to pay. During the audit respondent's revenue agent requested information about the reimbursements to Labor. Petitioner provided respondent with copies of 4-1/4-inch by 5-1/2-inch slips of paper *639 upon which were supposed to be all reimbursements to Labor. During the discovery period of this case, petitioner additionally provided an internal report entitled "Labor Activity Report". Upon comparing the information on the 4-1/4-inch by 5-1/2-inch slips with the Labor Activity Report, we found that the information on the slips was not complete. Apparently, petitioner also discovered this just prior to trial, because at trial petitioner attempted to submit a 10-page report to explain the differences between the slips and the Labor Activity Report. However, the explanation was untimely in light of our discovery rules, and thus the 10-page report is not in evidence for this trial. Also, respondent apparently never discovered the problem because at trial respondent's counsel indicated that she had not reviewed the Labor Activity Report, even though it had been provided to her during the discovery process, because she did not think the report was significant. Respondent attempted to bar the Labor Activity Report from evidence. However, the document was verified by two employees as a regular business document. The two employees identified their handwriting and explained its business *640 purpose to the Court. Fed. R. Evid. 803(6). Therefore, petitioner's Labor Activity Report was received into evidence. During the audit respondent's revenue agent discovered that petitioner's Los Angeles assistant office manager, Daniel Infante, had drafted a number of petitioner's checks payable to cash. Petitioner provided reliable evidence tracing the money from those checks to the purchase of Bank of America cashier's checks. Those cashier's checks were then deposited in a company account that was in the Los Angeles office manager's name, Luis Jesena, [8] at Crocker Bank. Petitioner's agent followed this procedure because Labor's agent banked at Crocker Bank and wanted immediate access to any money deposited into the Labor account. A company check remitted to Labor would have taken several days to clear; in contrast, money from a cashier's check was immediately available upon deposit. Moreover, there were cultural reasons for this rather *641 complex process.[9] In the Philippines it is very important to keep sources of money private. Petitioner's managers are native Filipinos or first generation Filipino-Americans. We have previously recognized cultural motivations for doing business in certain ways. See Patel v. Commissioner, T.C. Memo. 1988-33. We accept Mr. Infante's credible testimony about the method and reasons for the transfers. Because respondent underestimated petitioner's repayments to Labor, respondent also underestimated petitioner's total payments to foreign beneficiaries. Although petitioner's method was unusual, petitioner has shown that its income is properly reflected on its books and records. We thus find that petitioner has no unreported taxable income for the fiscal year ended May 31, 1987. Issue 2. Ordinary *642 and Necessary Business Expenses
Respondent determined that petitioner had not paid $ 403,489 to Mr. Jesena because petitioner did not remit checks to Mr. Jesena and Mr. Jesena did not cash such checks. Alternatively, respondent determined that if the $ 403,489 is found to have been paid to Mr. Jesena, the payments do not constitute ordinary and necessary business expenses. Petitioner disagrees. Petitioner and Mr. Jesena have a mutually advantageous business arrangement. Petitioner is located in the United States and deals in U.S. currency; Mr. Jesena is in the Philippines and deals with Philippine currency. When Mr. Jesena needs dollars paid in the United States, he asks petitioner to pay the dollars for him, and when petitioner needs pesos in the Philippines, petitioner asks Mr. Jesena to pay those pesos. This arrangement allows both petitioner and Mr. Jesena to effect quick, economical financial transactions in the two countries. Mrs. Santa Maria, manager of one of petitioner's San Francisco offices, wrote checks to Mr. Jesena to reflect reimbursements to him for some of the months' expenses; for other months she made adjusting journal entries. [10] She did this to document *643 the amount of the expenses. However, when Mrs. Santa Maria wrote a check she immediately signed the check, with Mr. Jesena's permission, and redeposited the check into petitioner's checking account. This method of reimbursing Mr. Jesena caused respondent some understandable doubt as to whether Mr. Jesena was actually receiving this reimbursement, or whether this was the manufacture of deductible expenses by petitioner. Petitioner's representatives explained that the dollars owed to Mr. Jesena are kept in the United States. Any funds that petitioner owes to Mr. Jesena are repaid to him by payments to either Labor or U.S. beneficiaries as requested by Mr. Jesena. Having reviewed the transactions, the checks, the adjusting journal entries, [11] and the repayments made at Mr. Jesena's direction, we are convinced that Mr. *644 Jesena did indeed receive repayment for his expenses as well as payment for the contractual agreement of $ 1 per transaction. In general, section 162 allows a deduction for ordinary and necessary business expenses. The term "ordinary" means that the expense must have a reasonably proximate relationship to the operation of the taxpayer's trade or business. Deputy v. DuPont, 308 U.S. 488, 495-496 (1940); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 660 (1962). The term "necessary" in the context of section 162 means that the expense must be "appropriate" or "helpful" to the taxpayer's trade or business. Commissioner v. Heininger, 320 U.S. 467, 471 (1943); Carbine v. Commissioner, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985). *645 Respondent claims that the amounts paid to Mr. Jesena are for expenses Mr. Jesena incurred in the Philippines rather than for petitioner's expenses. Petitioner points out that it had a contract with Mr. Jesena to make door-to-door deliveries in the Philippines, thereby incurring expenses that petitioner would reimburse. Mr. Jesena and his employees made just over 200,000 such deliveries for just over $ 400,000, or around $ 2 per delivery. [12] This per-delivery charge appears reasonable for the 600-700 deliveries per day that are required to effect over 200,000 deliveries in a year. Oscar Jesena employed 20-30 delivery personnel as well as 5-10 bookkeepers to keep track of the transactions. Obviously, Mr. Jesena had to incur large expenses to comply with his agreement with petitioner. The expenses reimbursed to Mr. Jesena are costs that had *646 a proximate relationship to the operation of petitioner's business. And those costs are appropriate and helpful in carrying out petitioner's business. For the above reasons, we hold that petitioner is entitled to deduct $ 403,489 paid to Mr. Jesena as ordinary and necessary business expense. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. On brief, both parties indicated that the audit for 1989 was continuing and that more information would be forthcoming. No further information was submitted to this Court regarding this issue. In its reply brief, petitioner indicated that the parties had informally agreed that the NOL for 1989 would be determined in conformity with our findings herein. For this reason a Rule 155 calculation will be necessary.↩
3. Mr. Jesena's orders totaled $ 27,754,726 according to stipulations by the parties.↩
4. On rare occasions, Labor would ask petitioner to transfer money to its Hong Kong office.↩
5. Petitioner charged customers a service fee which ranged from $ 5 to $ 8 per transaction. The rest of the funds received from customers were transmitted to Philippine beneficiaries. The average fee was $ 6 per transaction according to respondent's revenue agent. Petitioner reported $ 1,483,385 in income from service fees for transmitting money to the Philippines. $ 1,483,385 divided by $ 6 results in approximately 247,231 transactions. Petitioner deducted $ 221,881 as the $ 1 per transaction service fee charged by Mr. Jesena.↩
6. The difference between petitioner's $ 56,805,439 and respondent's $ 56,071,726 is $ 733,713 which is $ 1 different from $ 733,714. There is no explanation given for this difference.↩
7. Although the numbers do not quite match up, there may be a timing issue in regard to some portion of the accounts payable to foreign beneficiaries at yearend. Respondent did not raise the issue; thus we will not address the issue.↩
8. Luis Jesena is the brother of Mrs. Santa Maria and Oscar Jesena.↩
9. This problem no longer exists because petitioner's bank now has wire transfer capabilities. Mr. Infante testified that the payments to the Labor account are now made by wire transfer.↩
10. Petitioner's personnel were unsure how best to document the expenses under these circumstances and alternated between writing checks to Mr. Jesena and writing journal entries to book the expense.↩
11. In reviewing the journal entries, the amounts payable to Mr. Jesena are included in the amounts classified as payable to Philippine beneficiaries.↩
12. Mr. Jesena was paid $ 1 per transaction plus reimbursement of certain costs. Once all costs are considered, the total delivery fee per transaction is approximately $ 2.↩