T.C. Memo. 2009-157

UNITED STATES TAX COURT

JAMES T. AND TIFFANY A. MANNING, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30112-07.                    Filed June 30, 2009.

<u>Farley P. Katz</u> and <u>Charles J. Muller, III</u>, for petitioners.

<u>Daniel N. Price</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined a $714,924 deficiency in petitioners' Federal income tax for 2003 and a $142,984.80 accuracy-related penalty under section 6662.[1]

---

[1]All section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

After concessions, we are left to decide three issues.[2]

The first issue is whether payments James Manning (petitioner) made to Warrior Fund, LLC (Warrior) are deductible under section 162. We hold the payments are deductible because they are ordinary and necessary business expenses. In so holding, we also hold that the payments are not illegal payments under section 162(c)(2), nor are they barred from deductibility under the economic substance doctrine. The second issue is whether petitioner generated taxable gains as a trading agent of a Warrior subaccount. We hold he did not because the gains belonged to Warrior, not petitioner. The third issue is whether petitioners are liable for the accuracy-related penalty under section 6662. We hold that petitioners are not liable for an accuracy-related penalty.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, second supplemental stipulation of facts, and their accompanying exhibits are incorporated by this reference.

Petitioners are husband and wife who resided in Texas at the time they filed the petition. Petitioners timely filed a joint Federal income tax return for 2003.

_____

[2]Respondent concedes that petitioners are not taxable on $590,862 in unreported gross receipts or sales and that petitioners are entitled to deduct $60,951 in professional fees. Petitioners concede they mistakenly deducted $100,000 in commission rate adjustments in 2003 that were actually paid in 2004.

Petitioner's Career as a Day Trader

Petitioner received a bachelor's degree in business management from Southwest Texas State University in 1995. Shortly thereafter, he entered the high-paced day trading industry.

Day traders use software to track stock values and may trade hundreds of thousands of shares per day trying to profit from minute-to-minute changes in their value. Day trading is extremely risky and often results in substantial financial losses in a short time. In fact, many day traders buy on borrowed money, increasing their risk beyond their invested capital. The Securities and Exchange Commission (SEC) warns that day traders should be prepared to lose their entire investment because of the risk of large and immediate financial losses. Petitioner, however, beat the odds and consistently made money as a day trader.

Despite his success, petitioner began to desire a more stable and less stressful job when his first child was born. He began to coach other traders in 2001 while continuing to trade his own account. Petitioner mastered how the day trading business operates during this time. Petitioner then decided to open his own business and began negotiations with Assent, LLC (Assent), the largest national broker-dealer that provided direct-access electronic trading and other services to day traders.

Petitioner became the initial branch manager and General Securities Principal (GSP) of Assent's office in Austin, Texas (branch office). Petitioner operated the branch office through a wholly owned entity, James T. Manning, LLC, a disregarded entity for Federal income tax purposes. Petitioner leased the offices and provided computers, monitors, and extremely fast T-1 lines for Internet connection at the branch office.

Petitioner's duties, as branch manager, included handling compliance matters for the branch office and supervising the traders. Petitioner was also a Class B member of Assent. Class B members act as group leaders and recruit business to Assent. Assent compensated petitioner for his work as a Class B member by permitting him to share in the commissions generated by branch office customers. Petitioner was not separately compensated for serving as branch manager.

Assent's Commission Arrangement With Petitioner

Assent charged its customers for various services, including commissions on executed trades. Petitioner negotiated the commission rates with the customers, and the customers paid the commissions directly to Assent. Assent charged commissions as an amount per 1,000 shares of stock purchased or sold; i.e., $5 per 1,000 shares. Assent kept a portion of the customers' commissions and paid the rest to petitioner. Assent's commission rate was tied to the volume of shares traded through the branch office. Assent lowered its commission rate when the branch office reached certain tiers in the volume of shares traded. All

shares traded through the branch office were charged the lower rate once the share volume reached the next volume tier.

Petitioner's business model focused on increasing the branch office's trading volume, thereby lowering Assent's commission rate and allowing petitioner more flexibility to negotiate commissions with branch office customers. Accordingly, petitioner actively recruited customers who were group leaders with multiple traders trading under them. For example, petitioner recruited Mike Kestler and Jonathan Kirkland, group leaders affiliated with a different branch office of Assent. Other group leaders were organized as limited liability companies (LLCs).

Petitioner recruited Vantage Capital, LLC (Vantage) and Warrior, two high-volume LLCs, to trade through the branch office. These LLCs opened a main account with Assent. Individual traders who were members of the LLCs acted as designated trading agents and traded the funds in the main account. Their trading activity was tracked through individual subaccounts for accounting purposes. Petitioner negotiated with group leaders to determine the commission rates for each of their trading agents, and these rates were assigned to the trader's subaccount. When a designated trading agent executed a trade, Assent would charge the LLC the negotiated commission rate for that subaccount.

In addition, petitioner brought in many individual accounts.

Commission Rate Adjustments

The LLCs and the group leaders sought the lowest possible commission rates because they traded huge volumes of shares. The branch office competed against firms nationwide to attract and keep these customers. Petitioner could request that Assent make a commission rebate to a customer who demanded lower commissions. Assent routinely made commission rebates where the customer exceeded certain target levels set by a GSP or a branch manager. Assent required GSPs and branch managers to process requests for commission rebates on an Assent form. Petitioner requested that Assent make rebates to customers on a number of occasions, but they were not happy with the time it took Assent to process the requests. Petitioner began to make payments directly to customers from his share of the commissions (commission rate adjustments) to keep them happy. Assent would have made any rebates petitioner requested provided they did not affect Assent's share of the branch office income. Accordingly, the economics were identical for all parties whether Assent processed a commission rebate or petitioner made a commission rate adjustment.

Petitioner made commission rate adjustments for Warrior, Vantage, Mr. Kirkland, and Mr. Kestler that depended on their trading volume. Warrior was the branch office's largest customer and generated most of the branch office's trading volume. Assent charged Warrior an average commission of $3.75 to $4.25 per thousand shares traded. Assent kept $2 as profit and paid

petitioner the remaining amount.  Petitioner agreed to make commission rate adjustments so that Warrior's net commission rate would be about $2.25 per thousand shares traded.  Accordingly, petitioner's net earnings were about 25 cents per thousand shares traded after commission rate adjustments.

Petitioner reported the commission rate adjustments as "commission adjustments" on Forms 1099-B, Proceeds From Broker and Barter Exchange Transactions, issued to each customer. Petitioner then deducted $1,335,185 as "commissions" on the Schedule C, Profit or Loss From Business, for 2003.  Warrior reported all the commission rate adjustments it received as income for tax purposes.

Petitioner maintained his books and records for 2003 on QuickBooks.  Petitioner wife's mother, Vicki McGee, entered all the source data, including checks.  Ms. McGee mistakenly recorded two commission rate adjustments as paid on December 31, 2003, even though petitioner actually paid them on January 16, 2004. Richard Springer, a certified public accountant, prepared petitioners' tax return for 2003.  Petitioner believed that the records he provided to Mr. Springer were accurate, and they were accurate with the exception of the two commission rate adjustments that were paid in 2004.

John Manning and Warrior

John Manning (petitioner's brother) was a day trader with the Midas touch.  He partnered with several day traders who desired to work with him because of his success.  He formed

Warrior in 2002 to consolidate his multiple trading partnerships under one common entity. Petitioner's brother provided most of Warrior's capital from his own funds and various loans. Petitioner lent his brother $500,000 to help fund the initial trading partnerships, and Warrior took over this debt. Petitioner became a "preferred member" of Warrior, giving him a priority right to repayment of the $500,000 loan principal at a 5-percent interest rate. Petitioner had no right of control or management as a result of his interest. Warrior's books reflected that petitioner did not share in its profits or losses. Petitioner received $24,375 in interest from Warrior in 2003, and he reported it. Petitioner continued to receive interest until the full principal was repaid.

The trading partners became designated trading agents of Warrior, each designated by a separate subaccount. The trading agents were authorized to act as agents on Warrior's behalf. All gains or losses on the Warrior account belonged to the entity itself subject to negotiated subaccount profit splits. Warrior entered into written agreements with the trading agents setting out the terms of the profit splits. These terms depended on the amount of capital contributed by the individual trader, if any, and the trader's experience. Warrior issued Schedules K-1, Member's Share of Income, Credits, Deductions, etc., to its members reporting their income from profit-splitting agreements.

Petitioner occasionally traded a Warrior subaccount during his downtime to keep a presence in, and check the pulse of, the

market.  His trading activity generated gains of $208,329 during 2003.  Warrior was entitled to all profits generated in the subaccount.  Petitioner invested no money in the main Warrior account, had no interest in the subaccount gains, and never received any of those gains.

2005 Events

After losing significant customers to better commission rates, including Vantage, Mr. Kirkland, and Mr. Kestler, petitioner decided to reevaluate his business model.  Petitioner had also lost individual customers who left to trade through LLCs like Vantage or Warrior.

Petitioner discussed changing his business structure with his brother in 2005.  Petitioner had found two new scanning software programs, which he believed could substantially increase Warrior's trading profits.  Petitioner advised his brother to purchase all rights to both programs, and Warrior did, for $190,000 each.  By purchasing all rights to that software, Warrior completely controlled it and no competitors could use it. Warrior's profitability and volume increased as a result of the new software, and its retention of traders improved.

Petitioner agreed to supervise and maintain the new software for a split of Warrior's profits.  Petitioner received no interest in Warrior's capital, however.

Assent's Compliance

Since 2003 Assent has been subject to numerous reviews by self-regulatory organizations (SROs) like the National

Association of Securities Dealers (NASD) and various exchanges and has an excellent compliance record. No complaints were ever filed by customers against the branch office or against petitioner. Assent's Director of Compliance periodically conducted compliance reviews of the branch office and concluded that the office was generally in compliance with Assent's requirements. Assent has never sanctioned petitioner, nor has petitioner been sanctioned by or had adverse determinations from the SEC or the Texas Securities Board.

Genesis of Respondent's Investigation

Despite petitioner's excellent compliance record, respondent challenges the commission rate adjustments petitioner paid to Warrior. Respondent questioned the commission rate adjustments after investigating petitioner's brother concerning his tax reporting position that he was a resident of the United States Virgin Islands (USVI) from 2002 through 2004. Petitioner's brother established residency in the USVI because he was persuaded that he could obtain significant tax benefits by moving there and participating in a statutory economic development program. He entered into various agreements with The March Group, LLLP, a Virgin Islands limited liability partnership, to facilitate obtaining these tax benefits.

Petitioner's brother received all Warrior's income from his trading gains, shares of the gains generated by other Warrior traders, and commission rate adjustments from petitioner. He reported on the USVI returns all Warrior's income that flowed

through to him through various entities, except for some payments that went to The March Group. In addition, petitioner's brother claimed a 90-percent economic development tax credit. He stopped claiming USVI residency in 2005 when guidance was released that challenged the tax benefits he was receiving.

Respondent issued petitioners a deficiency notice for 2003 as a result of the investigation into his brother's alleged tax sheltering activities in the USVI. Respondent's determinations treat the commission rate adjustments paid to Warrior differently from those paid to other customers because petitioner's brother ultimately received the payments and reported them as income in the USVI. Petitioners timely filed a petition.

OPINION

I.   Introduction

We must now determine whether petitioner took part in his brother's alleged tax sheltering activities in the manner alleged by respondent. Respondent's determinations depend on the premise that petitioner made commission rate adjustments to Warrior only to lower petitioner's taxable income and that these payments were funneled back to petitioner in later years. We ultimately conclude that the record does not support respondent's determinations.

We first address the burden of proof. We then determine whether petitioner's commission rate adjustments to Warrior are deductible by petitioner as ordinary and necessary business expenses under section 162. In doing so, we decide whether the

commission rate adjustments were illegal payments under section 162(c)(2) or lacked economic substance. We then turn to whether petitioners must include Warrior subaccount gains in gross income. We finally address whether petitioners are liable for an accuracy-related penalty under section 6662.

## II. Burden of Proof

The parties disagree as to whether the burden of proof shifted to respondent under section 7491(a).[3] The Commissioner's determinations in the deficiency notice are generally presumed correct, and the taxpayer has the burden of proving that the Commissioner's determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). At trial we granted petitioners' motion to shift the burden of proof to respondent under section 7491(a) because we found that they introduced credible evidence, substantiated items, maintained required records, and fully cooperated with respondent's reasonable requests.[4] See sec. 7491(a)(2)(A) and (B). We stand by our ruling. Accordingly, respondent bears the burden of proof as to all issues relevant to petitioners' liability for the deficiency.

---

[3]The parties agree that respondent bears the burden of proof concerning new issues under Rule 142 and whether the commission rate adjustments were illegal payments under sec. 162(c)(2). Respondent also bears the burden of production concerning the accuracy-related penalty. See sec. 7491(c).

[4]The Court invited the parties to address this issue on brief. We have carefully reviewed the parties' arguments and stand by our ruling that petitioners' challenge of a summons in Federal District Court and motion for protective order in the Tax Court reflected petitioners' legitimate discovery concerns. See Kohler v. Commissioner, T.C. Memo. 2006-152.

III. Deductibility of Petitioner's Payments to Warrior

We now address whether petitioner's commission rate adjustments to Warrior are deductible under section 162. Initially, we note that respondent allowed deductions to petitioner for similar payments to Vantage, Mr. Kirkland, and Mr. Kestler. Respondent disallowed deductions for the payments to Warrior under several theories involving the relationship between petitioner and his brother. Respondent's primary argument is that petitioner's payments to Warrior are not deductible under section 162(a) because the payments were not ordinary and necessary business expenses. Respondent also makes two alternative arguments against deductibility. Respondent first argues that petitioner is barred from deducting the payments because they are illegal payments under section 162(c)(2). Respondent then argues that the payments are not deductible because the transactions lack economic substance. We address each of respondent's arguments in turn.

A.    Ordinary and Necessary Business Expenses

Tax deductions are a matter of legislative grace, and taxpayers must satisfy the specific statutory requirements for the item claimed. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). A taxpayer is generally permitted to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Sec. 162(a). The determination of whether an expenditure

satisfies the requirements for deductibility under section 162 is a question of fact.  See <u>Commissioner v. Heininger</u>, 320 U.S. 467, 475 (1943).  In general, an expense is ordinary if it is considered normal, usual, or customary in the context of the particular business out of which it arose.  See <u>Deputy v. du Pont</u>, 308 U.S. 488, 495 (1940).  Generally, an expense is necessary if it is appropriate and helpful to the operation of the taxpayer's trade or business.  See <u>Commissioner v. Tellier</u>, 383 U.S. 687, 689 (1966); <u>Carbine v. Commissioner</u>, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985).

Respondent argues that petitioner's commission rate adjustments to Warrior were not ordinary because the payments ran contrary to Assent's written policies and the regulatory framework in which Assent operated.  We disagree.

It is common in the day trading industry to lower commissions to attract and retain customers.  Assent, a large, nationwide broker-dealer servicing day traders, routinely made commission rebates when requested by a GSP or a branch manager.  Petitioner began making direct commission rate adjustments for several customers when they complained of the untimeliness of Assent's commission rebates.  Whether petitioner or Assent paid the commission rebates did not change the economics.[5]  Customers demanded that their commissions be lowered, and petitioner

---

[5]The parties agree that "three-cornered" transactions between Assent, petitioner, and Assent's customers are not rebates for tax purposes and are subject to the rules of deductibility.

negotiated the commission rate adjustments at arm's length to keep them.

Respondent does not challenge the ordinary nature of payments made to Vantage, Mr. Kirkland, or Mr. Kestler, only those made to Warrior. Warrior was the branch office's biggest customer and generated significant trading volume. Petitioner was aware that Warrior could demand a very low commission rate elsewhere. In addition, petitioner hoped Warrior's trading would cause the branch office to meet certain volume tiers, lowering Assent's commission rate. Petitioner could then have the flexibility to lower commissions and attract more traders. The commission rate adjustments are expenses that would be expected of someone trying to increase and maintain business in the highly competitive world of day trading. This is true regardless of whether the customer is Warrior, Mr. Kirkland, Mr. Kestler, or Vantage. Accordingly, we hold petitioner's payments to Warrior were ordinary expenses for section 162 purposes. See Corrigan v. Commissioner, T.C. Memo. 2005-119.

Respondent further argues that the payments were not necessary because customers chose Assent for reasons beyond the commission rates, including Assent's software, and because petitioner could have processed commission rate adjustments through Assent. Again, we disagree. Petitioner has satisfied the Court that commission rates were the most critical element to customers. Petitioner eventually lost Mr. Kirkland, Mr. Kestler, and Vantage as customers when they found better commission rates

elsewhere.  Further, petitioner did not use the Assent form to process volume rebate credits because his customers were dissatisfied by the untimeliness of these payments.  An expense may be necessary even where the taxpayer could have avoided it by pursuing a different course of conduct.  <u>Mason & Dixon Lines, Inc. v. United States</u>, 708 F.2d 1043, 1044-1045 (6th Cir. 1983).  Petitioner's payments were appropriate and helpful to keep customers trading through the branch office given the highly competitive nature of the day trading industry.  Accordingly, we hold that petitioner's payments to Warrior were necessary for section 162 purposes.

B.    Illegal Payments Under Section 162(c)(2)

We now turn to whether petitioner's commission rate adjustments to Warrior, while ordinary and necessary, are not deductible because they are illegal payments under section 162(c)(2).  Respondent argues that petitioner's payments to Warrior are illegal payments under section 162(c)(2) because they were made in violation of Federal law implemented by NASD rule 2110.[6]

Deductions are not allowed for payments that constitute an illegal bribe, an illegal kickback, or other illegal payment under any law of the United States.  The term "laws of the United States" includes only Federal statutes, including State laws which are assimilated into Federal law by Federal statute, and

---

[6]We do not address whether an NASD rule can properly be considered a "law of the United States" as it is unnecessary to our holding.

legislative and interpretive regulations thereunder. Sec. 1.162-18(a)(4), Income Tax Regs. The term is further limited to statutes that prohibit some act or acts for the violation of which there is a civil or criminal penalty. Sec. 1.162-18(a)(4), Income Tax Regs. Respondent bears the burden of establishing by clear and convincing evidence that the commission rate adjustments constitute illegal payments. See secs. 162(c)(2), 7454(a); Rule 142(b).

The NASD is a nonprofit Delaware corporation registered with the SEC as a national securities association.[7] The NASD serves as an SRO subject to extensive oversight, supervision, and control by the SEC on an ongoing basis. See 15 U.S.C. sec. 78s (2006). NASD conduct rule 2110 provides: "A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade." Respondent argues that petitioner's payments to Warrior were commission-sharing payments that violated NASD rule 2110 and subjected him to sanction or suspension by the NASD. See Dept. of Enforcement v. Ryerson, Complaint No. C9B040033 (N.A.S.D.R. Aug. 3, 2006) (holding that an NASD member violated rule 2110 when the member shared commissions with an unlicensed person who directed customers to him).

---

[7]An organization's bylaws and rules must conform to the Securities Exchange Act of 1934, as amended, to become a registered securities association. 15 U.S.C. sec. 78o-3(b) (2006).

Respondent's argument is misplaced. First, petitioner returned commissions paid by Warrior, a customer, to ensure that Warrior continued trading through the branch office. These payments were not commission-sharing payments made in return for referrals of business, as in Dept. of Enforcement v. Ryerson, supra. Respondent has not otherwise met his burden of showing by clear and convincing evidence that petitioner's commission rate adjustments would be classified by the NASD as commission-sharing payments or that these payments would result in petitioner's being subject to a civil or criminal penalty or losing his license. In fact, no adverse compliance determinations were made against petitioner by Assent, the NASD, or the SEC regarding these payments.

Further, deductions are barred under section 162(c)(2) for payments that are illegal in and of themselves. Bilzerian v. United States, 41 Fed. Cl. 134, 138 (1998). There must be a "federal or state law that the payment specifically violates." Id. at 140. The relevant statute or regulation must "prohibit some act or acts." Sec. 1.162-18(a)(4), Income Tax Regs. Respondent cites no statute or regulation specifically prohibiting petitioner's payments but relies only on a general rule requiring ethical conduct. We conclude that the payments to Warrior are not illegal per se. Accordingly, we hold that respondent has not proven by clear and convincing evidence that petitioner's commission rate adjustments were illegal within the meaning of section 162(c)(2).

C.   Economic Substance

We now turn to respondent's argument that petitioner's payments to Warrior are not deductible because they lacked economic substance.  The effect of disregarding a transaction for lack of economic substance is that, for taxation purposes, the transaction is viewed to have never occurred at all. Klamath Strategic Inv. Fund, LLC v. United States, __ F.3d __, __ (5th Cir., May 15, 2009) (slip op. at 17); see also Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 294 (1999), affd. 254 F.3d 1313 (11th Cir. 2001).  Accordingly, deductions are generally prohibited for expenditures in furtherance of a transaction that is disregarded for lack of economic substance. Klamath Strategic Inv. Fund, LLC v. United States, supra at __ (slip op. at 17); Winn-Dixie Stores, Inc. v. Commissioner, supra at 294.

Respondent argues that petitioner and John Manning entered into a symbiotic business relationship intended to produce mutual tax benefits in 2003.  He contends petitioner's payments to Warrior were returned to petitioner in later years that are not before the Court and argues that we should use the economic substance doctrine to disregard petitioner's payments to Warrior. We have fully examined the evidence and find that it does not support respondent's contention.

Petitioner has produced credible evidence and testimony accounting for all payments he received from Warrior in 2005 and later years.  Petitioner received a return of all principal plus

interest on his $500,000 loan by the end of 2006.  Petitioner also received a share of Warrior's profits in later years when he became responsible for operating and maintaining new trading software he convinced Warrior to purchase.  We conclude that the profit-splitting arrangement was attributable to petitioner's new responsibilities at Warrior and not devised for tax avoidance purposes.  Petitioner properly reported his portion of Warrior profits reflected on Schedules K-1 for 2005 and later years and was taxed on these amounts.

Respondent also argues that petitioner's arrangement with Warrior lacked economic substance because it was not an arm's-length arrangement.  He contends that low initial commissions, rather than high initial commissions with the prospect of rebates, would reflect an arm's-length arrangement.  We have found, however, that these arrangements were common practice at Assent.  Petitioner has satisfied the Court that the commission rate adjustments paid to Warrior were necessary and legitimate business expenses, indistinguishable from those paid to unrelated parties.  These payments resulted in net commissions to Warrior comparable to those Warrior could have negotiated directly with Assent or other broker-dealers.  There were no strings attached.  Accordingly, we hold that the deductibility of petitioner's payments is not barred by the economic substance doctrine.

IV.  Subaccount Trading Gains

We now decide whether petitioner must include gains from a Warrior subaccount in gross income for 2003.  Gross income

includes all income from whatever source derived, unless specifically excluded from gross income. Sec. 61(a); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 430 (1955). Respondent argues that the subaccount gains are includable in petitioner's gross income because other Warrior traders included gains generated in their respective subaccounts. Respondent ignores the facts.

The other Warrior traders included their portions of subaccount gains in gross income because they received these gains. Petitioner was not entitled to the gains, nor did he receive them. Traders who were entitled to subaccount gains had written agreements with Warrior setting the terms of the profit splits. They also received Schedules K-1 reflecting their portions of the subaccount gains. Petitioner had no agreement with Warrior giving him rights to a share of the subaccount gains. Respondent has presented no evidence to the contrary, and we find petitioner's testimony credible as to this issue. In fact, respondent acknowledges that the subaccount belonged to Warrior and that all gains generated in the subaccount were passed through a series of entities and ultimately to petitioner's brother.

We conclude that petitioner had no ownership interest in or rights to the subaccount and never received any funds from the subaccount. Accordingly, we hold that petitioner is not required

to include the subaccount trading gains in gross income for 2003.[8]

## V.   Accuracy-Related Penalty

We finally consider whether petitioners are liable for an accuracy-related penalty under section 6662.  Petitioners are liable for an accuracy-related penalty for any portion of an underpayment attributable to negligence or disregard of rules and regulations.  Secs. 6662(a) and (b)(1).  Negligence includes "any failure to make a reasonable attempt to comply with the provisions of this title," and the term "disregard" includes "any careless, reckless, or intentional disregard."  Sec. 6662(c). Negligence also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs.

We have found for petitioners on all issues.  Petitioners mistakenly deducted two commission rate adjustments in 2003 even though they were not in fact paid until the following year.  All of petitioners' records were accurate and thorough except for this mistake.  In fact, respondent conceded more than $500,000 in alleged unreported deposits after considering the accuracy of petitioners' records.  We find, after considering all the facts and circumstances, that petitioners are not liable for the accuracy-related penalty under section 6662(a) for 2003.

_____

[8]Respondent first raised the issue of whether the subaccount gains were includable in petitioner's gross income in the answer. Respondent therefore has the burden of proof as to this issue, which we find respondent has not met.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.  To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered under Rule 155</u>.