T.C. Memo. 2005-119


UNITED STATES TAX COURT


ROBERT E. CORRIGAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3588-96.                    Filed May 23, 2005.


Robert E. Corrigan, pro se.

<u>Margaret S. Rigg</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GERBER, <u>Chief Judge</u>:  Petitioner seeks the redetermination of respondent's determinations contained in two separate notices of deficiency.  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue.  All Rule references are to the Tax Court

Rules of Practice and Procedure. Respondent determined the following income tax deficiencies, penalties, and additions to tax for petitioner's 1987 through 1991 taxable years:[1]

| Year: | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|
| Deficiency: | $374,201 | $86,517 | $105,165 | $173,542 | $40,337 |
| **Additions to tax and penalties under secs.:** | | | | | |
| 6651(a)(1) | 58,840 | 11,931 | 8,710 | 41,598 | 5,997 |
| 6653(a)(1)(A) | 15,607 | --- | --- | --- | --- |
| 6653(a)(1) | --- | 3,755 | --- | --- | --- |
| 6653(a)(1)(B) | ---[1] | --- | --- | --- | --- |
| 6653(b)(1)(A) | 78,269 | --- | --- | --- | --- |
| 6653(b)(1) | --- | 10,573 | --- | --- | --- |
| 6663 | --- | --- | 13,786 | 21,190 | 10,240 |
| 6653(b)(1)(B) | ---[2] | --- | --- | --- | --- |
| 6662(a) | --- | --- | 13,828 | 30,571 | 5,337 |

[1] 50 percent of interest due on $280,318.
[2] 50 percent of interest due on $62,059.

After concessions by the parties, the issues remaining for our consideration are: (1) Whether petitioner's debt that was forgiven as part of a settlement agreement is includable in petitioner's 1990 income; (2) whether petitioner's stock and option trading activity was a trade or business entitling him to claim ordinary losses and/or business deductions on a Schedule C, Profit or Loss From Business; (3) whether petitioner's capital gains/losses for 1987, 1990, and 1991 were correctly reported; (4) whether petitioner is entitled to deduct payments or

---

[1] Respondent also determined substantial understatement and negligence additions to tax under former secs. 6661 and 6653(a) for 1987 and 1988, respectively, and under sec. 6662(a) for 1989 through 1991 as an alternative position if the fraud penalty were not sustained under sec. 6653(b) or sec. 6663 as the case may be.

brokerage commission rebates claimed for 1987 and 1988; (5) whether petitioner is entitled to defer gain realized from the 1987 sale of a residence under section 1034 and, if not, the amount of gain to be recognized; (6) whether petitioner is entitled to deduct losses from a horse breeding activity for 1987 through 1991; (7) whether petitioner has shown that respondent's determination that petitioner failed to report certain items of income was in error; (8) whether petitioner is entitled to itemized deductions for interest expenses, casualty losses, and employee expenses in excess of the amounts allowed by respondent; (9) whether petitioner is entitled to dependency deductions for his children and/or a personal exemption for his former wife; (10) whether petitioner is liable for additions to tax and accuracy-related penalties for negligence for 1987 through 1991; and (11) whether petitioner is liable for additions to tax and penalties for substantial understatements.

## FINDINGS OF FACT[2]

Petitioner resided in Newport Beach, California, at the time his petition was filed. Petitioner's Federal income tax returns for 1987, 1988, 1989, 1990, and 1991 were filed on December 20, 1988, October 9, 1990, November 17, 1990, February 26, 1993, and

----

[2] The parties' stipulation of facts is incorporated by this reference.

March 26, 1993, respectively. Petitioner and respondent entered into timely agreements extending the period for assessment for each tax year in controversy.

Petitioner married Jo Ann Corrigan (Mrs. Corrigan) during 1965, and they had four children. Petitioner holds a master's degree in finance and in business administration and began working as a stockbroker in southern California during 1970. Beginning in 1976, petitioner began working as a stockbroker in San Francisco, California. Although petitioner and Mrs. Corrigan legally separated during 1973, they moved to Walnut Creek, California, and lived together in a home with their children. Petitioner and Mrs. Corrigan jointly purchased the home in Walnut Creek for $89,000. They remodeled the Walnut Creek home and added a barn and horse stables to the property at a cost of approximately $70,000. After the improvements, Mrs. Corrigan began boarding, breeding, and showing horses.

At the time of their 1973 separation, petitioner and Mrs. Corrigan entered into a property settlement agreement providing for child support, custody, and alimony. Mrs. Corrigan was given physical and legal custody of the four children under the agreement. On what purported to be joint returns for 1987 through 1991, petitioner claimed dependency exemptions for his four children and a personal exemption for Mrs. Corrigan. Respondent conceded that petitioner is entitled to file the

returns as head of household for 1987 through 1991. Respondent also conceded that petitioner is entitled to dependency exemptions for David in 1987 through 1989, Erin in 1987 through 1991, Robert in 1987 and 1991, and Amy in 1991.

After petitioner and Mrs. Corrigan's divorce became final during 1977, they continued to cohabit. Petitioner left his position in San Francisco during 1978 and accepted a new position as a stockbroker with Smith Barney Harris Upham (Smith Barney) in southern California. Petitioner flew to the Smith Barney office in San Francisco for business on Fridays, and spent most weekends with his family at his Walnut Creek home that he continued to maintain as his principal residence.

Petitioner and Mrs. Corrigan purchased new residences and left the Walnut Creek home during 1986. The Walnut Creek home was sold for $254,000 during 1987. On the 1987 Federal income tax return, petitioner reported the Walnut Creek home sale and attempted to defer the gain by attaching a Form 2119, Sale or Exchange of Principal Residence. The Form 2119 reflected that gain was realized from the Walnut Creek home sale and that the recognition of the gain was to be deferred pursuant to former section 1034.

During 1986, petitioner and Mrs. Corrigan jointly purchased real property in Chino, California, for $495,000. Mrs. Corrigan operated the property as a ranch, and her initials were used to

name the ranch "JAC Ranch". Although the mortgage on the ranch was in petitioner's name alone, the deed to the property reflected joint ownership by petitioner and Mrs. Corrigan. Mrs. Corrigan used JAC Ranch as her primary residence beginning in 1986. Petitioner owned a home in Newport Beach, California, which he used as his primary residence beginning in 1986. Although petitioner and Mrs. Corrigan maintained separate residences during the years in issue, they occasionally spent time together in the same household.

During 1984, petitioner accepted a position as an account executive at Prudential-Bache (Prudential). At Prudential, the position of account executive was the equivalent of a senior stockbroker. Petitioner was not a licensed stockbroker or dealer in securities, and no license was required to act as a senior stockbroker for Prudential. During 1984, Prudential lent petitioner $390,000, which was evidenced by petitioner's promissory note to Prudential. Under the terms of the loan, petitioner was required to make six annual $65,000 installments with the first installment due July 1985. Petitioner made one $65,000 installment, leaving an unpaid balance of $325,000.

Petitioner resigned his position at Prudential during August 1985 without repaying the outstanding $325,000 loan balance. Prudential sought to collect the loan balance and submitted its $325,000 claim to arbitration. Petitioner asserted several

grounds that related to his employment as counterclaims against Prudential, including breach of contract, breach of the covenant of good faith and fair employment, fraud, negligent misrepresentation in petitioner's hiring, and punitive damages. During 1990, the arbitration proceeding was settled. Under the settlement, Prudential released petitioner from his obligation to repay the $325,000 loan balance, and petitioner agreed to drop his employment-related claims. Petitioner's attorney wrote petitioner a letter stating that the $325,000 would be reclassified by Prudential as punitive damages, but the attorney did not provide any tax advice regarding this item.

Prudential, in connection with the settlement and release of the loan obligation, issued petitioner a Form 1099 MISC, Miscellaneous Income, for 1990 reflecting $325,000 as nonemployee compensation to petitioner. Petitioner did not report the settlement as income.

During 1987, while petitioner's dispute with Prudential was ongoing, he transferred his interests in the JAC Ranch and the Newport Beach residence to Mrs. Corrigan. Mrs. Corrigan quit-claimed the deeds for both properties back to petitioner once the Prudential matter was settled. At all pertinent times, petitioner was the sole mortgagee and the only person obligated to make mortgage payments with respect to the mortgage on the JAC Ranch property.

Mrs. Corrigan intended to use the JAC Ranch for the breeding, sale, and showing of horses.  She had no source of income or capital other than what she received from petitioner.  She used these funds to pay the operating expenses and mortgage payments for JAC Ranch.  Mrs. Corrigan generally requested, and petitioner advanced, approximately $10,000 per month for the payment of expenses for hay and grain, breeding costs, hired help, and the purchase, training, and showing of horses.  During the time petitioner made these payments, he and Mrs. Corrigan were legally divorced.

Petitioner and Mrs. Corrigan did not enter into a joint venture or profit and loss agreement with respect to the operation of the JAC Ranch.  Petitioner and Mrs. Corrigan were divorced when they filed what purported to be joint Federal income tax returns and joint amended returns.  The purported joint returns included claimed losses with respect to the activities at the JAC Ranch.  Petitioner and Mrs. Corrigan were not entitled to file joint income tax returns for the years under consideration.

Attached to the purported joint returns were Schedules C reflecting Mrs. Corrigan as the operator and sole proprietor of the ranch.  On separate Schedules C, petitioner, alone, was shown

as the operator and sole proprietor of an activity in which he claimed to be engaged in the trade or business of buying and selling options and commodities.

Petitioner claimed and respondent disallowed a theft loss of $21,000 for 1987. Petitioner's claim was on the basis of a report he filed with the local police reflecting a $21,000 theft of cash from his Newport Beach home. There was no evidence of forced entry, and petitioner's claimed theft was not solved or verified by local authorities. Petitioner did not seek reimbursement of the claimed $21,000 loss from his homeowner's insurance company.

During 1987 through 1991, petitioner was employed by Smith Barney as an account executive in Newport Beach, California. He earned commissions of $1,081,313, $321,692, $527,900, $361,105, and $205,064 for 1987, 1988, 1989, 1990, and 1991, respectively. On his 1987 through 1991 returns, petitioner claimed and respondent disallowed expenses for work-related travel as itemized deductions on the Schedules A, Itemized Deductions, attached to each return.

Smith Barney, as a broker, and petitioner, as a Smith Barney employee, dealt in syndicated stock offerings during 1987 and 1988, which differed from regular stock transactions in that the underwriting of the stock involved risk to the broker. Because of the increased risk, the transaction commissions were

substantially larger and, on occasion, reductions in the amount of commissions were negotiated.

During 1987 and 1988, JLB Capital, which was owned by Jack Bergman (Bergman), was a Smith Barney customer which was serviced by petitioner. Petitioner was the account executive for three JLB Capital accounts. JLB Capital was operated by Bergman as a proprietorship during the years at issue. In 1987 and 1988, JLB Capital purchased syndicated stock offerings through petitioner, who negotiated with Bergman to rebate a portion of the commission petitioner received from Smith Barney for syndicated stock sales to JLB Capital. On his 1987 and 1988 tax returns, petitioner claimed reductions in gross income for "rebates" of $289,926 and $135,000, respectively.[3] The rebates were paid out of the commissions petitioner earned from Smith Barney. Petitioner issued Forms 1099 to JLB Capital with respect to the above-described payments.[4]

Petitioner managed a Smith Barney brokerage account in his name and a second account held jointly with Mrs. Corrigan during

---

[3] For 1988, petitioner also claimed a reduction in income of $23,837 for an amount claimed to be paid to an Anitra Kalagian. Petitioner concedes that this item is not proper to consider in computing his tax liability.

[4] For 1987 and 1988, petitioner was able to show, by means of canceled checks, that he had paid rebates of $265,699 and $115,000, respectively, to JLB Capital or Bergman. The Forms 1099 issued to JLB Capital and the canceled checks are the only support petitioner provided for the rebates reported on his returns.

1987 through 1991. A third Smith Barney account was held in Mrs. Corrigan's name only during the same period. Petitioner was the account executive for each of these three accounts.

Petitioner purchased and sold options and commodities through these accounts that resulted in both gains and losses. Petitioner used the account in his name (account No. 06K-153400) to buy and sell options and commodities during the years 1987 through 1989, and 1991. Petitioner incurred the following net gains and (losses) from trading in the account solely in his name:

| Year | Net Income/(Loss) |
|------|-------------------|
| 1987 | $116,185 |
| 1988 | (4,704) |
| 1989 | 25,845 |
| 1991 | 27,375 |

Petitioner bought and sold commodities and options through the joint account (account No. 06K-151106) with Mrs. Corrigan during 1987 and 1988. Petitioner's share of gains and (losses) from the joint account were as follows:

| Year | Net Income/(Loss) |
|------|-------------------|
| 1987 | $7,243 |
| 1988 | (22,163) |

Petitioner was the account executive for the third account (account No. 06K-127531), which was solely in Mrs. Corrigan's name. The transactions in that account and the amount of gains and losses are not those of petitioner.

The number and frequency of the purchases and sales of commodities and options in the above-described accounts are as follows:

| Year | Petitioner's Account | Joint Account | Mrs. Corrigan's Account | Total Sales or Purchases |
|------|------|------|------|------|
| 1987 | 23 | 5 | 51 | 79 |
| 1988 | 39 | 37 | 4 | 80 |
| 1989 | 19 | 0 | 22 | 41 |
| 1990 | 0 | 0 | 3 | 3 |
| 1991 | 11 | 0 | 21 | 32 |

Petitioner claimed that his dealing in options and commodities constituted a trade or business.

## OPINION[5]

Petitioner challenged numerous adjustments determined by respondent for 1987 through 1991. After trial, petitioner requested and was permitted several extensions of time for the filing of his factual and/or legal arguments with the Court. Ultimately, petitioner did not file a posttrial brief to assist the Court in better understanding his position regarding the errors that he alleged exist with respect to respondent's determinations.

I. Settlement and Release of $325,000 Debt

During 1984 petitioner borrowed $390,000 from Prudential. Petitioner repaid $65,000 and continued to owe $325,000 as of 1985, when he resigned his position with Prudential. Prudential

---

[5] Sec. 7491 does not apply because the audits for 1987 through 1991 occurred before 1998.

sought to collect petitioner's $325,000 obligation and petitioner asserted counterclaims for breach of contract, breach of the covenant of good faith and fair employment, fraud, negligent misrepresentation in petitioner's hiring, and punitive damages.

During 1990, petitioner and Prudential agreed to a mutual release of all claims between them. According to the terms of the release, in exchange for petitioner's release of all claims, Prudential in turn released petitioner from all claims, "including without limitation as to any and all promissory notes by or [indebtedness] of Corrigan to Prudential-Bache." Correspondingly, petitioner released Prudential from all of the asserted counterclaims.

Petitioner contends that the settlement is to be excluded from income under section 104(a)(2) because it was for a tortlike personal injury and/or that it was to settle a claim for punitive damages. Respondent counters that petitioner has not shown that the settlement was for tortlike injuries, and, even if the settlement were for punitive damages, it would not be excludable under section 104(a)(2).

Section 61(a) provides that "all income from whatever source derived" is gross income unless otherwise excluded by statute. The definition of gross income includes income from the discharge of indebtedness. Sec. 61(a)(12); sec. 1.61-12(a), Income Tax Regs. Accordingly, receipt of funds by a taxpayer is presumed to

be gross income unless it can be demonstrated that the accession to wealth is specifically excluded by law.  See <u>Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 431 (1955).

Petitioner was relieved of his obligation to pay the remaining $325,000 due on his promissory note to Prudential and, therefore, realized income from the forgiveness of debt, unless petitioner can show that the income may be excluded.[6]  Petitioner contends that section 104(a)(2) should apply to exclude the $325,000 from his income.  Section 104(a)(2) provides:

> SEC. 104(a).  In General.--Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include--
>
> \*      \*      \*      \*      \*      \*      \*
>
> (2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness;
>
> \*      \*      \*      \*      \*      \*      \*
>
> \* \* \* Paragraph (2) shall not apply to any punitive damages in connection with a case not involving physical injury or physical sickness.

The term "damages received", as used in section 104(a)(2), is defined as an amount received "through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution."

---

[6] The exclusions from gross income set forth in sec. 108(a)(1) are not applicable in this case.

Sec. 1.104-1(c), Income Tax Regs. In the context of a settlement agreement, the nature of the claim that was the basis for a settlement controls as to the question of whether damages are excludable under section 104(a)(2). United States v. Burke, 504 U.S. 229, 237 (1992).

The determination of the nature of a claim is a question of fact. Robinson v. Commissioner, 102 T.C. 116, 126 (1994), affd. in part, revd. in part, and remanded on another issue 70 F.3d 34 (5th Cir. 1995). When a settlement agreement explicitly allocates settlement proceeds between damages for tort type personal injuries and other types of damages, that allocation may be respected if a Court finds that it was the product of arm's-length, adversarial, and good faith negotiations. Id. at 127.

However, where a taxpayer settles contract claims and tort claims for a lump-sum amount and neither the agreement nor other evidence provides a basis to allocate any portion to tort claims for personal injuries, the courts have decided that they are not in a position to be able to make allocations on the parties' behalf. See Taggi v. United States, 35 F.3d 93, 96 (2d Cir. 1994); Reisman v. Commissioner, T.C. Memo. 2000-173, affd. 3 Fed. Appx. 374 (6th Cir. 2001). Under those circumstances, the settlement proceeds have been held to be includable in a recipient's income. See, e.g., Morabito v. Commissioner, T.C. Memo. 1997-315.

Petitioner relies upon a letter received from his attorney stating that Prudential was willing to "reclassify the $390,000 dollars [sic] given to you in 1984 as a loan to a punitive damage settlement award in your lawsuit."  The release, however, states that the settlement is for all claims that petitioner had asserted in connection with his employment and his termination. The release is silent with respect to any allocation to a particular claim and/or punitive damages.

For the $325,000 to be excluded under section 104(a)(2), petitioner must meet a two-prong test and demonstrate:  (1) That the underlying cause of action giving rise to recovery is based upon tort or tort type rights, and (2) that the damages were received on account of personal injuries.  Commissioner v. Schleier, 515 U.S. 323, 336-337 (1995).  Unless both prongs are met, the payment is not excludable from gross income under section 104(a)(2).  Id.

In that regard, petitioner has not shown that the underlying cause of action that gave rise to recovery was based upon tort or tort type rights.  Most of petitioner's claims appear to be on the basis of contractual rights.  A tort is defined as a "'civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages.'"  United States v. Burke, supra at 234 (quoting Keeton et al., Prosser & Keeton on the Law of Torts 2 (5th ed. 1984)).  In the absence of

a general Federal common law of torts or controlling definitions in the Internal Revenue Code, we look to State law to determine the nature of the claim litigated. United States v. Mitchell, 403 U.S. 190, 197 (1971); Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938).

Although petitioner's claims for fraud and negligent misrepresentation may sound in tort, such claims generally involve economic loss rather than personal injury.[7] In that regard, petitioner testified that his claim against Prudential arose from lost commissions. He did not offer any alternate reasons for his dispute and counterclaims with Prudential.

Finally, concerning petitioner's claim that the settlement was for punitive damages, section 104(a) as in effect for the year in issue specifically states that amounts received on account of personal injuries or sickness "shall not apply to any punitive damages in connection with a case not involving physical injury or physical sickness."[8] There is no indication that petitioner's settlement was based on physical injury or physical

---

[7] See Prosser, Law of Torts 5, at 683-684 (4th ed. 1971).

[8] The 1989 amendment adding this provision is effective for amounts received after July 10, 1989, unless received (A) under a written agreement, court decree, or mediation award in effect, or issued on or before, July 10, 1989, or (B) pursuant to any suit filed on or before July 10, 1989. Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7641, 103 Stat. 2379. Because the discharge of indebtedness occurred after July 10, 1989, and was pursuant to an arbitration claim rather than the filing of a suit, the amendment applies to the discharge of indebtedness.

sickness, even if it were for punitive damages.  Accordingly, we hold that petitioner has not shown that he is entitled to exclude the $325,000 settlement from his gross income.

II.  Commodity and Option Trading Activity

During the years under consideration, petitioner was a successful stockbroker earning annual commissions ranging from $200,000 to in excess of $1 million.  In addition, during the years under consideration, petitioner claimed to be in the trade or business of trading options and commodities.  Substantially all of the transactions reported from this activity consisted of option trading in three separate stock brokerage trading accounts.  The three accounts included one in petitioner's name, one held jointly with Mrs. Corrigan, and one in Mrs. Corrigan's name.  Likewise, the cost of goods sold reflected on the Schedules C was, in substantial part, the purchase price of the options that had been sold.  In addition to the cost of goods sold, petitioner claimed deductions for various expenses.  The activity was reported on the Schedules C under the name "Corrigan Enterprises", and losses were claimed for 1987, 1988, 1989, and 1991 of $96,098, $25,774, $124,073, and $34,907, respectively.

Respondent determined that this activity produced capital rather than ordinary gains and losses.  In addition, respondent allocated the gains and losses between petitioner and Mrs. Corrigan in accord with their ownership of the accounts,

allocating to petitioner all the gains and losses from the account in his name only and one-half of the gains and losses from the joint account held with Mrs. Corrigan. Respondent also determined that the gains and losses were short-term. Finally, respondent determined that petitioner had not substantiated the deductions claimed on the Schedules C.

A. Substantiation of Schedule C Deductions

Even if petitioner shows that he was engaged in a trade or business, he is obligated to show that deductions of expenses in controversy are ordinary and necessary and were paid during the year of deduction.

Petitioner did not introduce evidence showing that the expenses deducted were ordinary and necessary and/or were paid during the year of deduction. Therefore, petitioner is not entitled to the deductions for expenses claimed on the Schedules C for Corrigan Enterprises.

B. Dealer, Trader, or Investor

Generally, for Federal tax purposes, individuals who purchase and sell securities have been characterized into one of three categories: Dealers, traders, and investors. See Estate of Yaeger v. Commissioner, T.C. Memo. 1988-264, affd. on this issue 889 F.2d 29 (2d Cir. 1989). Petitioner concedes that he is not a dealer, so any gains and losses would be capital in nature, not ordinary. See sec. 1221(a)(6). The parties dispute whether

petitioner is a trader or investor only because the expenses petitioner claimed for Corrigan Enterprises would not be trade or business expenses if petitioner were an investor.  Having found that petitioner is not entitled to the deductions he claimed for Corrigan Enterprises, we need not determine whether petitioner is a trader or investor.

III.  Capital Gains and Losses

Although petitioner attempted to file joint Federal income tax returns, he was not entitled to do so because he and Mrs. Corrigan were divorced at the time he attempted to file.  Had petitioner and Mrs. Corrigan been entitled to file joint returns, it would not matter that the gains and losses from the joint account and Mrs. Corrigan's account were netted with the gains and losses in petitioner's account.  Because petitioner and Mrs. Corrigan were not entitled to file joint returns, we must decide whether petitioner was entitled to report the gains or losses from each of the three accounts.

When transacted through a brokerage account, gains and losses from the sale of stock and options are reportable by the owner of the account in the absence of any evidence demonstrating that another person is the true or equitable owner.  See Ruth v. Commissioner, 962 F.2d 14 (9th Cir. 1992), affg. without published opinion T.C. Memo. 1991-30.

The gains and losses in the three brokerage accounts were allocated by respondent according to which person owned the account. At trial, petitioner testified that he was the sole owner of all three accounts and was entitled to all the claimed losses. His testimony, however, was inconsistent with the allegations in his petition alleging a joint venture with Mrs. Corrigan on the accounts. To some extent, petitioner's testimony on this point was inconsistent. For example, he contradicted himself as to whether the proceeds of sales in the account in Mrs. Corrigan's name were remitted to her. Petitioner did not provide any corroborating testimony or evidence supporting his claim that the account ownership, in substance, differed from the form.

Accordingly, we sustain respondent's allocations of the capital gains and/or losses from the three accounts.

IV. Deduction of Payments Claimed as Brokerage Commission Rebates

While employed as a stockbroker during 1987 and 1988, petitioner was responsible for servicing Smith Barney customers, including JLB Capital, a sole proprietorship owned by Bergman. Petitioner earned $1,081,313 and $321,692 in commissions from that activity during 1987 and 1988, respectively. Also for 1987 and 1988, petitioner claimed reductions in income for "rebates"

to JLB Capital of $289,926 and $135,000, respectively.[9] Petitioner contends that he rebated the amounts to JLB Capital to induce the purchases of certain syndicated stock offerings during 1987 and 1988.

It was not unusual for brokerage firms that offered syndicated stock to accept reduced commissions. That is on the basis of the fact that commissions for syndicated stock transactions were generally larger than those for other stock transactions. Petitioner reported the gross commission income received from Smith Barney for his sales of syndicated stock to JLB Capital. He reduced the amount reported as income by the rebates or payments made to JLB Capital as an inducement to trade with him.

Respondent contends that such payments are not deductible from petitioner's gross income and, if allowable would, at very most, be unreimbursed employee expenses that may or may not be deductible as itemized deductions. Respondent also contends that these payments may be in violation of California securities law and that rebates of commissions may result in disciplinary action or suspension by the New York Stock Exchange. Respondent did not

---

[9] Even though petitioner could not substantiate the entire amount reported on his tax returns, petitioner was able to substantiate 85 percent of the claimed amounts by means of canceled checks. Petitioner's proffered evidence is sufficient to show that the amounts claimed were paid. See Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).

argue, however, that such payments would not be deductible as being illegal. See sec. 162(c)(2). Finally, respondent argued that the payments are not deductible as a rebate or price reduction because JLB Capital paid the commissions for its stock purchases to Smith Barney under their customer-broker business relationship.

The question we consider focuses upon whether petitioner is entitled to reduce the gross commission income received from Smith Barney or whether the payments he made to JLB Capital are deductible as employee business itemized deductions from adjusted gross income. We agree with respondent that in these circumstances petitioner is not entitled to reduce gross income by the payments made to JLB Capital. See Alex v. Commissioner, 70 T.C. 322 (1978), affd. 628 F.2d 1222 (9th Cir. 1980); see also Pittsburgh Milk Co. v. Commissioner, 26 T.C. 707 (1956) (in which such a reduction of income was permitted in a two-party transaction). Here, petitioner is an agent or employee of Smith Barney with whom JLB Capital and Bergman have contractual relationships regarding stock trading and commissions. The commissions received by petitioner in his role as a Smith Barney employee and the payments made to JLB Capital are not reductions or rebates of the customer's commission payments to Smith Barney.

Therefore, the payments are "three cornered", and petitioner is not entitled to a reduction from gross income. Alex v. Commissioner, supra at 1224-1225.

Rebates may be allowable under section 162 as business expenses if they are ordinary and necessary. The payments in Alex v. Commissioner, supra, were not deductible because of the prohibition against illegal deduction in section 162(c)(2). The payments made by petitioner here were not "illegal" within the meaning of section 162(c) and are ordinary and necessary expenses incurred in petitioner's trade or business of being an employee.

As to respondent's argument that petitioner could have sought reimbursement for rebate-like payments to Smith Barney customers, the record does not support a conclusion that the payments were reimbursable. Respondent's arguments on this point are internally inconsistent. Respondent, on one hand, points out that the payment may have violated California law and/or the rules of the New York Stock Exchange. On the other, respondent contends that these payments would be reimbursable. The possible impropriety of the payments would seem to dictate that such amount would not be reimbursable. Further, it is obvious from petitioner's testimony, and we find on the record before us, that the payments were not reimbursable.

Petitioner is entitled to deduct the amounts paid to JLB Capital. The deduction however is not from gross income because

section 62(a)(1) provides that such deductions, being attributable to petitioner's employment, are allowable as itemized deductions from adjusted gross income. See sec. 63(a).

Accordingly, we find that subject to certain limitations, petitioner is entitled to deduct itemized employee deductions on Schedules A of $289,926 for 1987 and $135,000 for 1988.

V. Sale of Residence

Under former section 1034,[10] which was in effect for petitioner's 1987 tax year, taxpayers were able to defer gain realized from the sale of their principal residence if they purchased a replacement residence and met certain other conditions. Section 1034, in pertinent part, provided:

> SEC. 1034(a). Nonrecognition of Gain.--If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him and, within a period beginning 2 years before the date of such sale and ending 2 years after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence.

Respondent's sole contention with regard to the sale of petitioner's residence is that if petitioner abandoned the Walnut Creek residence and had a new "principal residence" before the

---

[10] Sec. 1034 was repealed in connection with the Taxpayer Relief Act of 1997, Pub. L. 105-34, sec. 312(a) and (b), 111 Stat. 836, 839.

time of the sale, section 1034 does not apply to defer any gain from sale. Respondent relies on Perry v. Commissioner, 91 F.3d 82 (9th Cir. 1996), affg. T.C. Memo. 1994-247. Accordingly, the sole question we consider is whether the Walnut Creek residence was petitioner's "principal residence" for purposes of section 1034. In the Perry case, the taxpayer had, because of a divorce, left the home in question approximately 3 years before its sale. In that case, the Court of Appeals for the Ninth Circuit held that the home was not the taxpayer's principal residence because he had left it several years before it was placed for sale and sold. In other words, the taxpayer had ceased to "physically occupy and live in the house" long before it was intended to be sold. Id. at 85. On the basis of that reasoning in Perry, it appears that the taxpayer would not have met the 2-year before and after rule of section 1034.

In this case, petitioner and Mrs. Corrigan used the Walnut Creek home as their principal residence until some time in 1986 when they decided to sell it and each of them moved to new residences, one of which was jointly purchased by petitioner and Mrs. Corrigan. Unlike the taxpayer in Perry, petitioner did not cease using the Walnut Creek home as his principal residence several years before and then decide to sell it and reinvest in another home. Petitioner and Mrs. Corrigan moved to new residences and sold the Walnut Creek property within a relatively

short time (well within the 2-year requirement of section 1034). Thus, petitioner did not have more than one "principal residence". Sec. 1.1034-1(c)(3), Income Tax Regs.

Considering the above principles and the record in this case, the Walnut Creek property was petitioner's principal residence. Respondent does not contend that any other requirement of section 1034 was not satisfied. Accordingly, petitioner was entitled to defer any gain realized on the 1987 sale of that property.

VI. <u>Deduction of Losses From Horse Breeding Activity</u>

Petitioner claimed losses for 1987 through 1991 of $88,047, $40,811, $65,647, $116,737, and $27,351, respectively, from the operation of the JAC Ranch. The losses were claimed on what purported to be joint returns filed by petitioner and Mrs. Corrigan. Because the horse breeding activity to which these claimed losses are attributable was operated by and in the name of Mrs. Corrigan, and because petitioner was not entitled to file a joint return, he now contends that he and Mrs. Corrigan operated the activity as a joint venture, and that he is entitled to claim all of the losses reflected on the purported joint returns for 1987 through 1991.

Respondent disallowed the losses in their entirety, and the parties' dispute concerns the question of whether petitioner was entitled, as a joint venturer, to all of the losses for the horse

breeding activity at the JAC Ranch. The parties have not addressed the question of whether the losses are correct in amount or whether the activity was operated with the intent to make a profit. Respondent's position that petitioner was not a joint venturer is based upon the record and certain other factors. We agree with respondent that petitioner has failed to show that the horse breeding activity was a joint venture between petitioner and Mrs. Corrigan.

Initially, we note that the purported joint returns reflect that the horse breeding activity was operated by Mrs. Corrigan as a sole proprietorship. Her name alone was reflected on the Schedules C. By contrast, petitioner's name was the only one reflected with respect to his claimed option trading activity. This is a potent indication that Mrs. Corrigan was the sole operator and proprietor of the horse breeding activity.

Respondent also points out that for a partnership or joint venture to exist there should be (1) an agreement to share profit and losses, (2) a community of interest in the undertaking, and (3) a right of control over the activity. See, e.g., <u>Joe Balestrieri & Co. v. Commissioner</u>, 177 F.2d 867, 871 (9th Cir. 1949) (similar Federal statutory requirements exist), affg. a Memorandum Opinion of this Court; see also sec. 7701(b).

In that regard, petitioner has not shown that he had a right to participate in management or to control the activities at the

JAC Ranch.  Although petitioner did provide funding to Mrs. Corrigan for the operation of the activity, there is no showing that the character of these advances was debt or equity.  Even if the advances constituted an equity interest, that would not necessarily entitle petitioner to share in profits and losses.

Petitioner has alleged that there was a written agreement between him and Mrs. Corrigan regarding the sharing of profits and losses, etc.  No such agreement was produced, and no corroborating evidence was provided in support of petitioner's self-serving allegations.

In view of the foregoing, we hold that petitioner has not shown that he is entitled to claim losses from the horse breeding activity.

VII.  Unreported Income

Respondent determined that petitioner failed to report various items of income, including dividends, interest, State income tax refunds, and royalties during the years in issue. With the exception of a $1,902 adjustment that respondent now concedes was in error, petitioner has failed to present any evidence to show that respondent's determination was in error. The net amounts of unreported income for 1987, 1989, 1990, and 1991 are $44, $5,587, $15, and $26, respectively.  For 1988, respondent determined that petitioner overstated the various items of income by a net amount of $539.

Generally, petitioner is obligated to show that respondent's determination is in error. There are exceptions to that rule, one of which may concern the determination that there is unreported income. Under the holdings of the Court of Appeals for the Ninth Circuit (to which an appeal would normally lie for petitioner), the Commissioner is required to make a threshold evidentiary foundation to support a determination of unreported income. See Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977). Respondent has made a sufficient showing to shift to petitioner the obligation to show that respondent's determination is in error, which petitioner has failed to do. Wherefore, respondent's determination of unreported or overstated miscellaneous income items is sustained.

VIII.  Itemized Deductions

A.  Mortgage Interest

Respondent made determinations regarding petitioner's itemized deductions for mortgage interest for the years under consideration. Respondent has conceded that petitioner is entitled to mortgage interest deductions of $33,799, $21,308.24, $36,816.24, and $35,558.04 for 1988, 1989, 1990, and 1991, respectively. Petitioner appears to have contested the 1987 mortgage interest deduction for the Telegraph Avenue property. In that regard, respondent conceded that petitioner is entitled to $24,824.63 of mortgage interest attributable to the Telegraph

Avenue property for 1987. The remaining mortgage interest deductions for 1987 is not conceded, and petitioner has provided no evidence or argument to show entitlement to mortgage interest deductions in excess of those allowed or conceded by respondent. Accordingly, petitioner is not entitled to mortgage interest deductions in excess of those allowed by respondent.

### B. Casualty Losses

Petitioner claimed casualty losses attributable to theft of $21,000 and $31,860 for 1987 and 1991, respectively. Section 165(a) permits a deduction for losses not compensated for by insurance or otherwise. The loss for a casualty, however, is subject to limitations. The loss may be allowable for 1987 to the extent that it exceeds $100. Sec. 165(h)(1). In addition, the loss is deductible only to the extent that it also exceeds 10 percent of a taxpayer's adjusted gross income. Sec. 165(h)(2).

Applying those rules to petitioner's $21,000 claimed casualty loss for 1987, the amount would not exceed the statutory thresholds or limitations. First, the claim is limited to $20,900 ($21,000, less the $100 threshold). Second, because petitioner's adjusted gross income was approximately $495,000, the 10-percent limitation would preclude any deduction for a casualty loss of less than $49,500. Accordingly, petitioner is not entitled to an itemized casualty loss deduction for 1987.

With respect to petitioner's $31,860 casualty loss that he claimed for 1991, he testified that this was Mrs. Corrigan's loss and that there was an insurance recovery. Accordingly, petitioner is not entitled to any part of the $31,860 casualty loss that he claimed for 1991.

### C. Employee Expenses

Petitioner claimed deductions for each year at issue in connection with his employment. The deductions concerned travel, meals, and other employee-type expenses.

A taxpayer may deduct ordinary and necessary business expenses incurred in conducting a trade or business. Sec. 162(a). The term "trade or business" includes the trade or business of being an employee. Primuth v. Commissioner, 54 T.C. 374, 377 (1970). Section 274, however, limits deductions for entertainment and recreation that would otherwise be allowable unless it is established that the expenditures were directly related to or preceding a bona fide business discussion and were associated with the active conduct of a taxpayer's trade or business. See sec. 274(a)(1)(A). A deduction is allowed for meals only if such expenses are not lavish and the taxpayer is present when such meals are furnished. Sec. 274(k)(1). In addition, section 274(d) limits such deductions to those that can be substantiated by adequate records or other evidence corroborating the amount of the expenditure, the time and place

of the travel, entertainment, etc., the business purpose, and the business relationship of persons being entertained.

Petitioner claimed to have logs and other documentary evidence regarding these claimed expenses, but he did not produce them or offer them into evidence. Because of the rigorous requirements for substantiation for expenses of this variety, his uncorroborated testimony will not suffice, and we accordingly sustain respondent's determination disallowing petitioner's travel, entertainment, and related expenses.

IX. <u>Dependency and/or Personal Exemptions</u>

On his 1987 through 1991 returns, petitioner claimed dependency exemptions for his four children and a personal exemption for Mrs. Corrigan. Respondent conceded that petitioner was entitled to file his returns as head of household for 1987 through 1991, and that petitioner was entitled to dependency exemptions for David in 1987 through 1989, Erin in 1987 through 1991, Robert in 1987 and 1991, and Amy in 1991. All other dependency exemptions and the personal exemptions have not been conceded and were determined not allowable by respondent.

Section 151(c) provides for a deduction for each dependent (as defined in section 152). A "dependent", among others, can be a son or daughter "over half of whose support, for the calendar

year in which the taxable year of the taxpayer begins, was received from the taxpayer (or is treated under subsection (c) or (e) as received from the taxpayer)".  Sec. 152(a).

The circumstances of this case are such that petitioner provided all the support to his children and Mrs. Corrigan, who had no source of income and was dependent upon petitioner for the children's expenses and those of her horse breeding activity. During the years in question, petitioner was divorced and Mrs. Corrigan was awarded custody of the children who had not reached majority.  Petitioner's son Robert was 19 in 1988, resided with petitioner, and attended school for at least 5 months during each of the years in controversy.  Amy was a minor and resided with Mrs. Corrigan.

In addition, Mrs. Corrigan, who had no other source of income, subscribed to the joint returns in which dependency exemptions were claimed for all of the children.  This act by Mrs. Corrigan is tantamount to her consent in allowing petitioner to claim the exemptions.  These circumstances conform to the substance of Form 8332, Release of Claim to Exemption for Child of Divorced or Separated Parents, and meet the requirements for a noncustodial parent claiming dependency exemptions under section 1.152-4T(a), Q&A-3, Temporary Income Tax Regs., 49 Fed. Reg.

34459 (Aug. 31, 1984). Cf. <u>Miller v. Commissioner</u>, 114 T.C. 184, 188-189 (2000), affd. on other grounds sub nom. <u>Lovejoy v. Commissioner</u>, 293 F.3d 1208 (10th Cir. 2002).

Accordingly, petitioner is entitled to claim dependency exemptions for Amy in 1987 through 1991 and for Robert in all years including 1988, 1989, and 1990 (the years denied by respondent).

With respect to Mrs. Corrigan, petitioner is not entitled to claim a personal or dependency exemption because they were divorced, and she did not reside in his household. Secs. 151(b), 152(a)(9).

## X.  Negligence Additions to Tax and Accuracy-Related Penalties

For 1987 and 1988, respondent determined that petitioner was liable for an addition to tax for negligence under section 6653(a)(1) equal to 5 percent of the underpayment. For 1987, respondent also determined that petitioner was liable under section 6653(a)(1)(B) for an amount equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. For 1989 through 1991, respondent determined that petitioner was liable for a 20-percent accuracy-related penalty under section 6662(a) due to negligence or intentional disregard of the rules or regulations. The standards and principles

regarding these penalties are substantially similar, and, accordingly, we combine our discussion of whether respondent's determination should be sustained.

Negligence has been defined as "the lack of due care or the failure to do what a reasonable and prudent person would do under similar circumstances." Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989); Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). Negligence includes the "failure to make a reasonable attempt to comply with the provisions [of the Internal Revenue Code]" and/or to exercise ordinary and reasonable care in the preparation of a tax return. Secs. 6653(a)(3), 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. "Disregard" includes any careless, reckless, or intentional disregard. Secs. 6653(a)(3), 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.

The accuracy-related penalty under section 6662 does not apply with respect to any portion of an underpayment for which there was reasonable cause and the taxpayer acted in good faith. Sec. 6664(c)(1). Whether a taxpayer acted with reasonable cause depends on the facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor to be considered is the extent of the taxpayer's efforts to determine the proper income tax liability. Id. With respect to 1987 and 1988, section 6653(a)(1) provides that the 5-percent addition to tax

applies to the entire underpayment if any part of the underpayment is due to negligence or disregard of rules or regulations.

Respondent contends that petitioner's failure to maintain adequate books and records and to provide them to respondent supports the determination that petitioner was negligent. See sec. 1.6662-3(b)(1), Income Tax Regs. We agree with respondent that petitioner failed to maintain and to provide respondent or the Court adequate records with respect to the claimed deductions in connection with his option trading, travel, entertainment, and meals. In addition, respondent contends that petitioner was negligent in connection with the exclusion of the amount received in settlement of his relationship with Prudential. Finally, negligence has been asserted with respect to petitioner's claiming ordinary losses in connection with his option trading.

With respect to the exclusion of the settlement, petitioner contends that he relied on his attorney's advice that the settlement was for punitive damages. The attorney's letter, however, merely advised petitioner of the characterization of the settlement, not of the tax consequences. In addition, the relevant law for the year in issue provided that punitive damages were excludable from gross income only if arising from physical injuries or physical sickness. Accordingly, it was not

reasonable for petitioner to exclude the settlement on the basis of his attorney's characterization of the settlement as for punitive damages.

With respect to the disallowed deductions, the negligence penalty or addition to tax applies, and petitioner has not shown reasonable cause.  His negligence is on the basis of his failure to maintain records and failure to comply with rules or regulations.  As to petitioner's claim of ordinary loss status for his option trading activity, his business experience as a stockbroker and educational background placed petitioner in a position where he knew or should have known that his activity was not entitled to ordinary loss treatment.  See, e.g., Walker v. Commissioner, T.C. Memo. 1990-609.

XI.  Substantial Understatement Liabilities[11]

Section 6661, as applicable for 1987 and 1988,[12] provides for a 25-percent addition to tax for substantial understatements of tax liability.  See Pallottini v. Commissioner, 90 T.C. 498,

---

[11] Respondent had determined that the fraud penalty applied for each of the taxable years.  As an alternative, respondent determined that the substantial understatement penalty applied in each year.  Respondent conceded that the fraud penalty does not apply.

[12] Sec. 6661 was repealed for years with return due dates after Dec. 31, 1989, and recodified in sec. 6662.

503 (1988).  Section 6662(a) provides for a 20-percent addition to tax for tax years with return due dates after December 31, 1989.[13]

Petitioner bears the burden of showing that respondent's imposition of these additions to tax is erroneous.  Rule 142(a); <u>Tweeddale v. Commissioner</u>, 92 T.C. 501, 506 (1989).  Section 7491 is not applicable in this case because the audit of petitioner's returns began before July 22, 1998.

An understatement is "substantial" if the amount of the understatement for the applicable year exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6661(b)(1)(A).  Under section 6661, an "understatement" is defined as the excess of the tax required to be shown on the return over the amount of tax that is shown on the return reduced by any rebate within the meaning of section 6211(b)(2).  Sec. 6661(b)(2)(A).

The amount of the understatement is reduced by the portion of the understatement attributable to the tax treatment of any item if there is or was substantial authority for the treatment, or if there was adequate disclosure of the relevant facts

---

[13] Because the sec. 6662 penalty applies to negligence and substantial understatements, and we have found that petitioner was negligent with respect to all improperly reported items, we need not discuss sec. 6662 any further.

affecting the treatment of the item in the return or a statement attached to it. See sec. 6661(b)(2)(B); sec. 1.6661-3(a)(1), Income Tax Regs., T.D. 8017, 1985-1 C.B. 379.

Petitioner did not file a brief or provide at trial any authority (substantial or otherwise) regarding any of the adjustments by respondent for the taxable years under consideration. Accordingly, we consider whether petitioner's return contained adequate disclosure with respect to any of the adjustments by respondent. The adequate disclosure requirement under the regulations applicable for 1987 and 1988 is that the disclosure must show, inter alia: "The facts affecting the tax treatment of the item (or group of similar items) that reasonably may be expected to apprise the Internal Revenue Service of the nature of the potential controversy concerning the tax treatment of the item (or items)." Sec. 1.6661-4(b)(1)(iv), Income Tax Regs., T.D. 8017, 1985-1 C.B. 382.[14]

Concerning the claimed ordinary business deductions or losses from stock trading activity, petitioner reported that he was in the trade or business of buying and selling options, but

---

[14] We decide these items on an item-by-item basis and, ultimately, the parties' Rule 155 computation will be necessary to finally decide whether the threshold for application of the substantial understatement addition applies in any of the years under consideration.

he was not and he failed to disclose that he was a broker or dealer in options. See, e.g., Little v. Commissioner, T.C. Memo. 1993-281, affd. 106 F.3d 1445 (9th Cir. 1997).

In conjunction with the option trading question, we allocated between petitioner and Mrs. Corrigan the capital gains/losses from three separate accounts for 1987, 1990, and 1991. We note that of the three accounts in question, one was in petitioner's name, one in Mrs. Corrigan's, and one was jointly held between petitioner and Mrs. Corrigan. Petitioner and Mrs. Corrigan (from whom he was divorced at all pertinent times) attempted to file joint returns for 1987 through 1991. As a matter of law, they were not entitled to do so. Accordingly, we held that petitioner was not entitled to combine the gains and losses of the three accounts for reporting purposes. There was, however, no disclosure made on the returns indicating that petitioner and Mrs. Corrigan were divorced or that they were otherwise justified in filing a joint return. Likewise, it was not reasonable to claim joint filing status at a time when petitioner knew he was divorced. There was therefore no adequate disclosure or reasonable cause for the position reported by petitioner. We accordingly hold that the substantial understatement addition is applicable with respect to this adjustment for 1987.

Next, we consider the brokerage commission rebates that petitioner failed to include in gross income for 1987 and 1988. The question we consider with respect to those adjustments is whether there was adequate disclosure of such reductions from gross income.  Petitioner disclosed on his returns that he was reducing his income by the amount of the rebates reflected on the Forms 1099 he issued and thus adequately disclosed his position. Accordingly, petitioner is not subject to the substantial understatement additions to tax for 1987 and 1988 with respect to the understatement attributable to the rebate determination.

The adjustment concerning petitioner's claim that he is entitled to deduct all of the losses from the horse breeding activity at JAC Ranch for 1987 through 1991 is one that likewise was dependent as a threshold matter upon petitioner's being able to file a joint return with Mrs. Corrigan.  As already explained, there was no disclosure on the returns that petitioner and Mrs. Corrigan were divorced and, therefore, not entitled to file a joint return.  Likewise, it was not reasonable to claim joint filing status at a time when petitioner knew he was divorced. Accordingly, petitioner may be subject to the substantial understatement additions to tax for 1987 and 1988 as to the losses claimed from the JAC Ranch.

We have found that petitioner failed to report certain items of income, including interest and tax refunds.  These amounts were not disclosed on the return, and it was not reasonable for petitioner to fail to report these items, especially in light of the fact that Forms 1099 were issued with respect to them.  We therefore hold that the substantial understatement addition to tax may be applicable with respect to these income adjustments for 1987 and 1988.

Petitioner claimed various itemized deductions including mortgage interest, employee expenses, and casualty losses. Respondent has agreed that petitioner is entitled to mortgage interest deductions in each year in amounts that are less than the amount claimed by petitioner.  Respondent also disallowed casualty losses in 2 years due to failure to exceed the statutory threshold and failure to substantiate.  Finally, respondent disallowed petitioner's claimed employee business expenses for travel, entertainment, and meals.  With respect to each category, petitioner failed to substantiate amounts in excess of those allowed by respondent or failed to adequately substantiate any amount with respect to the employee business expenses and the casualty losses.  Petitioner has not shown a reasonable basis or adequate disclosure for those items, and, accordingly, to the

extent that a substantial understatement exists, the addition to tax or penalty applies with respect to these items for 1987 and 1988.

As to whether petitioner adequately disclosed or had a reasonable basis for claiming Mrs. Corrigan's personal exemption, it is clear that he did not and that the substantial understatement penalty may apply for this item for 1987 and 1988.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.